# 21-3064(L)

## 22-118(XAP)

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 21-3064(L), 22-118(XAP)

——◆◆◆——

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—v.—

VALDEZ SIMMONS, also known as Sealed Defendant 1,

*Defendant-Appellant-Cross-Appellee.*

―――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

MICHAEL D. MAIMIN,
T. JOSIAH PERTZ,
WON S. SHIN,
  *Assistant United States Attorneys,
    Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Jurisdiction for the Government's
    Cross-Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Statement of the Issue Presented on the
    Government's Cross-Appeal . . . . . . . . . . . . . . . .  2

Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.   Simmons's Offense Conduct and Plea . . . . .  3

    B.   Simmons's Sentencing . . . . . . . . . . . . . . . . .  6

ARGUMENT:

POINT I—Section 922(g)(9) Is Constitutional . . . . .  11

    A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . .  12

        1.   Standard of Review . . . . . . . . . . . . . . .  12

        2.   Section 922(g)(9) . . . . . . . . . . . . . . . . .  12

        3.   The Second Amendment and Prohibitions
            on Criminals Possessing Firearms . . .  14

        4.   *Bruen* . . . . . . . . . . . . . . . . . . . . . . . . .  15

    B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  18

        1.   Section 922(g)(9) Imposes No Burden on
            Law-Abiding, Responsible Citizens . .  19

        2.   Even If the Second Amendment Applies,
            Section 922(g)(9) Is Constitutional . . .  23

ii

PAGE

     a.   Section 922(g)(9) Is Presumptively
        Lawful Under *Heller* . . . . . . . . . .  23

     b.   Section 922(g)(9) Is Consistent with
        the Nation's Historical Tradition of
        Firearm Regulation. . . . . . . . . . .  28

POINT II—The District Court Miscalculated
    Simmons's Sentencing Guidelines . . . . . . . . .  42

  A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . .  42

  B.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  43

    1.  Standard of Review . . . . . . . . . . . . . . .  43

    2.  The Categorical Approach and Cocaine
       Isomers . . . . . . . . . . . . . . . . . . . . . . . .  43

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  49

    1.  Section 220.16(1) Does Not Reach
       Constitutional Isomers of Cocaine . . .  49

    2.  Simmons Did Not Meet His Burden of
       Demonstrating a Realistic Probability
       that Section 220.16(1) Would Be Applied
       to Constitutional Isomers of Cocaine .  53

POINT III—Simmons's Sentencing Claims Are
    Meritless. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

  A.  Applicable Law . . . . . . . . . . . . . . . . . . . . .  55

iii

PAGE

B. Judge Castel Did Not Plainly Err by
    Mentioning Simmons's Mental Health Issues
    During Sentencing . . . . . . . . . . . . . . . . . . . 56

    1. Applicable Law. . . . . . . . . . . . . . . . . . 57

    2. Discussion. . . . . . . . . . . . . . . . . . . . . 58

C. Simmons's Sentence Was Substantively
    Reasonable . . . . . . . . . . . . . . . . . . . . . . . . 65

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## TABLE OF AUTHORITIES

*Cases*:

*Avery v. Everett*,
    110 N.Y. 317 (1888) . . . . . . . . . . . . . . . . . . . . . . 36

*Best v. State*,
    556 A.2d 701, 79 Md. App. 241 (1989). . . . . . . . . 53

*Binderup v. Att'y Gen.*,
    836 F.3d 336 (3d Cir. 2016) . . . . . . . . . . . . . . 27, 34

*District of Columbia v. Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . *passim*

*Drummond v. Robinson Township*,
    9 F.4th 217 (3d Cir. 2021) . . . . . . . . . . . . . . . . . 31

*Folajtar v. Attorney General of the U.S.*,
    980 F.3d 897 (3d Cir. 2020) . . . . . . . . . . 31, 37, 38

iv

PAGE

*Hamilton v. Pallozzi*,
    848 F.3d 614 (4th Cir. 2017) . . . . . . . . . . . . . . . 36

*Heller v. Bedford Cent. Sch. Dist.*,
    665 F. App'x 49 (2d Cir. 2016) . . . . . . . . . . . . . . 16

*Hylton v. Sessions*,
    897 F.3d 57 (2d Cir. 2018) . . . . . . . . . . .  51, 53, 54

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) . . . . . . . . . . . . . . . 31

*McDonald v. City of Chicago, Ill.*,
    561 U.S. 742 (2010) . . . . . . . . . . . . .  15, 24, 25, 35

*Medina v. Whitaker*,
    913 F.3d 152 (D.C. Cir. 2019) . . . . . . . .  35, 36, 37

*Nat'l Rifle Ass'n of Amer. v. Bureau of Alcohol,*
    *Tobacco, Firearms, & Explosives*,
    700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . . . . 30

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) . . . . . . . . . . . . . . . . . *passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of*
    *New York*,
    140 S. Ct. 1525 (2020) . . . . . . . . . . . . . . . . . . 25, 26

*Puckett v. United States*,
    556 F.3d 129 (2d Cir. 2009) . . . . . . . . . . . . . . . . 12

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) . . . . . . . . . . . . 15, 22

*Tapia v. United States*,
    564 U.S. 319 (2011) . . . . . . . . . . . . .  57, 58, 60, 63

v

PAGE

*Tyler v. Hillsdale Cty. Sheriff's Dep't,*
  837 F.3d 678 (6th Cir. 2016) . . . . . . . . . . . . . . . . 34

*United States v. Anderson,*
  No. 21 Cr. 13, 2022 WL 10208253 (W.D. Va. Oct.
  17, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Bell,*
  524 F.2d 202 (2d Cir. 1975) . . . . . . . . . . . . . . . . . 27

*United States v. Belless,*
  338 F.3d 1063 (9th Cir. 2003) . . . . . . . . . . . . . . . 40

*United States v. Bena,*
  664 F.3d 1180 (8th Cir. 2011) . . . . . . . . . . . . . . . 32

*United States v. Bogle,*
  717 F.3d 281 (2d Cir. 2013) . . . . . . . . . .  15, 16, 24

*United States v. Booker,*
  644 F.3d 12 (1st Cir. 2011) . . . . . . . . . . . . . . 15, 24

*United States v. Broxmeyer,*
  699 F.3d 265 (2d Cir. 2012) . . . . . . . . . .  55, 65, 67

*United States v. Bryant,*
  711 F.3d 364 (2d Cir. 2013) . . . . . . . . . . . . . 19, 23

*United States v. Carpio–Leon,*
  701 F.3d 974 (4th Cir. 2012) . . . . . . . . . . . . . . . . 32

*United States v. Castleman,*
  572 U.S. 157 (2014) . . . . . . . . . . . . . . . . .  14, 24, 40

*United States v. Cavera,*
  550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . 56, 68

vi

PAGE

*United States v. Chappelle,*
  41 F.4th 102 (2d Cir. 2022) . . . . . . . . . . . . . . . . . 55

*United States v. Chovan,*
  735 F.3d 1127 (9th Cir. 2013) . . . . . . . . . . . . . . 15

*United States v. Colasuonno,*
  697 F.3d 164 (2d Cir. 2012) . . . . . . . . . . . . . . . . 27

*United States v. Counterman,*
  510 F. App'x 82 (2d Cir. 2013) . . . . . . . . . . . . . . 63

*United States v. Crum,*
  843 F. App'x 404 (2d Cir. 2021) . . . . . . . . . . . . . 55

*United States v. Dussard,*
  967 F.3d 149 (2d Cir. 2020) . . . . . . . . . . . . . . . . 12

*United States v. Fernandez-Taveras,*
  511 F. Supp. 3d 367 (E.D.N.Y. 2021) . . . . . . . . . 48

*United States v. Gilliard,*
  671 F.3d 255 (2d Cir. 2012) . . . . . . . . . . . . . . 58, 64

*United States v. Harry,*
  566 F. App'x 100 (2d Cir. 2014) . . . . . . . . . . . . . 62

*United States v. Hayes,*
  555 U.S. 415 (2009) . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Huet,*
  665 F.3d 588 (3d Cir. 2012) . . . . . . . . . . . . . . . . 27

*United States v. Jackson,*
  No. 22 Cr. 59, 2022 WL 3582504 (W.D. Okla. Aug.
  19, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

vii

PAGE

*United States v. Jimenez,*
  895 F.3d 228 (2d Cir. 2018) . . . . . . . . . . . . . 12, 16

*United States v. Keenan,*
  499 F. App'x 81 (2d Cir. 2013) . . . . . . . . . . . . . . 63

*United States v. Le,*
  902 F.3d 104 (2d Cir. 2018) . . . . . . . . . . . . . . . . 12

*United States v. Lifshitz,*
  714 F.3d 146 (2d Cir. 2013) . . . . . . . . . .  58, 64, 65

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . 35

*United States v. McIntosh,*
  753 F.3d 388 (2d Cir. 2014) . . . . . . . . . . . . . . . . 55

*United States v. Messina,*
  806 F.3d 55 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 52

*United States v. Moore,*
  975 F.3d 84 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 12

*United States v. Neal,*
  517 F. App'x 20 (2d Cir. 2013) . . . . . . . . . . . . . . 63

*United States v. Nutter,*
  No. 21 Cr. 142, 2022 WL 3718518 (S.D. W. Va.
  Aug. 29, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Olmeda,*
  837 F. App'x 52 (2d Cir. 2020) . . . . . . . . . . . . . . 65

*United States v. Perez,*
  6 F.4th 448 (2d Cir. 2021) . . . . . . . . . . . . . . . 16, 30

viii

PAGE

*United States v. Pope,*
554 F.3d 240 (2d Cir. 2009) . . . . . . . . . .  56, 65, 67

*United States v. Rene E.,*
583 F.3d 8 (1st Cir. 2009). . . . . . . . . . . . . . . . . . 32

*United States v. Rigas,*
583 F.3d 108 (2d Cir. 2009) . . . . . . . . . . . . . . . . 56

*United States v. Ross,*
719 F.2d 615 (2d Cir. 1983) . . . . . . . . . .  48, 51, 52

*United States v. Rozier,*
598 F.3d 768 (11th Cir. 2010) . . . . . . . . . . . . . . . 27

*United States v. Scott,*
990 F.3d 94 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 54

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010) . . . . . . . . . . . . 15, 33

*United States v. Staten,*
666 F.3d 154 (4th Cir. 2011) . . . . . . . . . . . . . . . . 15

*United States v. Thompson,*
961 F.3d 545 (2d Cir. 2020) . . . . . . . . . .  44, 50, 51

*United States v. Townsend,*
897 F.3d 66 (2d Cir. 2018) . . . . . . . . . . .  43, 44, 50

*United States v. Villafuerte,*
502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . 12

*United States v. Vongxay,*
594 F.3d 1111 (9th Cir. 2010) . . . . . . . . . . . 26, 32

*United States v. Whab,*
355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . . 18

ix

PAGE

*United States v. White,*
593 F.3d 1199 (11th Cir. 2010) . . . . . . . 15, 16, 28

*United States v. Yancey,*
621 F.3d 681 (7th Cir. 2010) . . . . . . . . . . . . . . . 31

*Voisine v. United States,*
579 U.S. 686 (2016). . . . . . . . . . . . . . . . . . . . 14, 24

*Whitman v. Am. Trucking Ass'ns,*
*Inc.,* 531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . 53

*Statutes, Rules & Other Authorities:*

8 U.S.C. § 1101(a)(43)(B) . . . . . . . . . . . . . . . . . . . . 42

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . . 15, 16

18 U.S.C. § 922(g)(9) . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 924(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . 42

18 U.S.C. § 3553(a)(2)(D) . . . . . . . . . . . . . . . . . . 57, 60

18 U.S.C. § 3582(a). . . . . . . . . . . . . . . . . . . . . . . . . 57

18 U.S.C. § 3742(b). . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.Y. Penal Law § 120.00(1) . . . . . . . . . . . . . 4, 11, 21

N.Y. Penal Law § 220.00(7) . . . . . . . . . . . . . . . . . 44

N.Y. Penal Law § 220.16(1) . . . . . . . . . . . . . . *passim*

N.Y. Pub. Health Law § 3306. . . . . . . . . . . . . *passim*

21 C.F.R. § 1300.01(b) . . . . . . . . . . . . . . . . . . . . 45, 49

x

PAGE

21 C.F.R. § 1308.12(b)(4) . . . . . . . . . . . . . . . . . . 45, 51

U.S.S.G. § 2K2.1(a)(4)(A) . . . . . . . . . . . . . . . . 2, 7, 43

U.S.S.G. § 2K2.1(a)(6)(A) . . . . . . . . . . . . . . . . . . . 43

U.S.S.G. § 4B1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

U.S.S.G. § 4B1.2(b) . . . . . . . . . . . . . . . . . . . . . . 42, 43

Robert H. Churchill, *Gun Regul., the Police Power, & the Right to Keep Arms in Early Am.: The Legal Context of the Second Amend.*,
25 LAW & HIST. REV. 139 (2007) . . . . . . . . . . 30, 31

Saul Cornell, *"Don't Know Much about History": The Current Crisis in Second Amendment Scholarship*,
29 N. KY. L. REV. 657 (2002) . . . . . . . . . . . . . . . 32

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*,
73 FORDHAM L. REV. 487 (2004) . . . . . . . . . . . . . 31

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*,
20 Wyo. L. Rev. 249 (2020) . . . . . . . . . . . . . . . . . 29

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*,
82 MICH. L. REV. 204 (1983) . . . . . . . . . . . . . 32, 38

Don B. Kates, Jr., *The Second Amendment: A Dialogue*,
49 LAW & CONTEMP. PROBS. 143 (1986) . . . . . . . 32

xi

PAGE

Note, *Civil Death Statutes:—Medieval Fiction in a Modern World*,
50 HARV. L. REV. 968 (1937) . . . . . . . . . . . . . . . . 38

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*,
62 TENN. L. REV. 461 (1995) . . . . . . . . . . . . . . . . 32

Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*,
57 CLEV. ST. L. REV. 461 (2009) . . . . . . . . . . . . . . 38

David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*,
99 MICH. L. REV. 588 (2000) . . . . . . . . . . . . . . . . 32

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket Nos. 21-3064 (L), 22-118 (XAP)

———————

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—v.—

VALDEZ SIMMONS, also known as Sealed Defendant 1,

*Defendant-Appellant-Cross-Appellee.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Valdez Simmons appeals from a judgment of con-
viction entered on December 15, 2021, in the United
States District Court for the Southern District of New
York, by the Honorable P. Kevin Castel, United States
District Judge, following Simmons' guilty plea. The
United States of America cross-appeals from the same
judgment of conviction.

Indictment 20 Cr. 294 (PKC) (the "Indictment")
was filed on June 8, 2020, charging Simmons in one
count with possessing a firearm after having been con-
victed of a misdemeanor crime of domestic violence, in
violation of 18 U.S.C. §§ 922(g)(9), 924(a)(2), and 2.

2

On February 22, 2021, Simmons pleaded guilty before Judge Castel, without the benefit of a plea agreement, to the sole count of the Indictment.

On December 14, 2021, Judge Castel sentenced Simmons to 48 months' imprisonment, to be followed by three years' supervised release, and imposed a $100 mandatory special assessment.

Simmons is serving his sentence.

## Statement of Jurisdiction for the Government's Cross-Appeal

On January 18, 2022, the Government filed a timely notice of appeal. This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b). The Solicitor General has authorized the prosecution of this cross-appeal.

## Statement of the Issue Presented on the Government's Cross-Appeal

Whether the District Court erroneously interpreted N.Y. PENAL LAW § 220.16(1), which prohibits possession with intent to sell a "narcotic drug," to reach isomers of cocaine that are not controlled by the federal Controlled Substances Act (the "CSA"), and thus erroneously concluded that a violation of Section 220.16(1) does not qualify as a "controlled substance offense" under U.S.S.G. §§ 2K2.1(a)(4)(A) and 4B1.2(b).

3

## Statement Of Facts

### A. Simmons's Offense Conduct and Plea

On May 18, 2011, Simmons brutally beat the mother of his infant daughter as she held the child. As Simmons's victim recounted:

> On May 18, 2011[,] Valdez got upset with me for turning off the television. As a result he began to punch me in the face and body. During the altercation, our five month old daughter . . . was directly in between the two of us. When I was able to get [my daughter] from between us, but while she was in my arms, and I was attempting to run away from him, he continued to repeatedly punch, and bite me in my head and about my body. I repeatedly asked him to stop hitting me, and to watch out for our daughter however, he did not stop. During this incident my daughter was screaming and crying, and I was very fearful for both of our safety.

(A. 41).[1] As a result, Simmons was charged with, and pleaded guilty to, assault in the third degree, in

_____

[1] "Br." refers to Simmons's initial brief on appeal; "A" refers to the appendix filed with that brief; "Supp. Br." refers to Simmons's supplemental brief on appeal; and "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with Simmons's sentencing. Unless

4

violation of N.Y. PENAL LAW § 120.00(1), a misde-
meanor, for which he was sentenced to ten months' im-
prisonment. (PSR ¶¶ 14, 40). This was far from Sim-
mons's only brush with violence. His extremely
lengthy criminal history (PSR ¶¶ 30–49) included,
among other things, three assault convictions (PSR
¶¶ 40, 42–43), two menacing convictions (PSR ¶¶ 35,
44), one conviction for criminal possession of a weapon
(PSR ¶ 39), and one attempted assault conviction (PSR
¶ 45), all as an adult. Simmons also has convictions
for, on one occasion, menacing (PSR ¶ 32), and, on an-
other occasion, five counts of assault, five counts of
robbery, one count of grand larceny, two counts of gang
assault, one count of menacing, and one count of crim-
inal possession of a weapon (PSR ¶ 31), each at the age
of 16. As a result of Simmons' conviction for assaulting
his infant child's mother, he was prohibited from pos-
sessing firearms. *See* 18 U.S.C. § 922(g)(9).

Despite Simmons's history and the legal prohibi-
tion, on May 2, 2020, Simmons was caught with a gun
in the Bronx. At about 6:30 pm, someone on the street
pointed to Simmons and shouted to a police officer
"he's got a gun," and told the officer that the man with
a gun was "right there. Book bag. Right there." (PSR
¶ 10). The police officer saw Simmons carrying a book-
bag and shouted to Simmons to stop; instead, Sim-
mons ran away, leading the police on a chase. (PSR
¶ 11). After hiding behind a car, Simmons stood up,
and slowly walked toward the police officer, despite

---

otherwise noted, case text quotations omit all internal
quotation marks, citations, alterations, and footnotes.

5

entreaties for him to lay down; finally, several paces later, Simmons laid down and was arrested. (PSR ¶ 11). The police found a .380-caliber Kel-Tec model P-3AT pistol under the car where Simmons was hiding, and a magazine next to it. (PSR ¶¶ 12–13). As Judge Castel, who watched the bodycam footage of the chase,[2] later described it at sentencing:

> The videos in this case reflect a very dangerous situation, and it's miraculous that there wasn't gunfire on the streets as a result of this episode.
>
> It begins showing a police officer who is just learning, and you hear on the tape, "got a gun." And the person points out who he's referring to, and the police officer sees that the individual takes off running, and turns the corner and continues to run and ducks in an alley.
>
> Perhaps the most frightening and disturbing part of the video is when the officer, shortly joined by his partner, stop at the alley and he sees the defendant and tells the defendant to get down, and the defendant doesn't. The defendant gets up, and from behind a scene where he can't be fully seen at first and comes towards the officer, that was a situation

_____

[2] Judge Castel "urge[d this] Court to view the bodycam videos." (A. 130 n.1). The Government will provide those videos to the Court upon request.

6

which, fortunately, did not result in the discharge of a firearm by a police officer in legitimate fear of his life. It was not comforting to hear the defendant say as he's being cuffed words to the [e]ffect of— and this is not a direct or literal quote— but I only wanted a fight, it was just a fight I was going to have.

This is someone who is expressing this at a point in time when he is carrying a firearm and ammunition.

(A. 113). Moreover, as Judge Castel later noted, in preparing for sentencing, Simmons told a doctor that "I hear voices that tell me to kill people and kill myself." (A. 114).

The Indictment was returned on June 8, 2020, charging Simmons with one count of violating 18 U.S.C. § 922(g)(9). (A. 11–12; PSR ¶ 1). On February 22, 2021, Simmons pleaded guilty before Judge Castel, without the benefit of a plea agreement. (PSR ¶ 2). Prior to Simmons's guilty plea, the Government provided Simmons with a letter setting forth its view that the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") provided for an advisory sentencing range of 63 to 78 months' imprisonment, which calculation was based on, among other things, Simmons's prior conviction for a controlled substance offense. (PSR ¶¶ 3, 41).

## B. Simmons's Sentencing

In advance of Simmons's sentencing, the Probation Office prepared a Presentence Report that calculated

7

Simmons's offense level to be 17—a base level of 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(A), because Simmons committed his offense after sustaining a conviction for a controlled substance offense, and a three-level reduction, pursuant to U.S.S.G. § 3E1.1, for acceptance of responsibility (A. 42)[3]—which meant that, at Criminal History Category V (PSR ¶ 51), Simmons faced an advisory Guidelines range of 46 to 57 month's imprisonment. The Probation Office recommended a sentence of 46 months' imprisonment, to be followed by two years' supervised release. (A. 46).

The Government agreed with the Probation Office's calculations (A. 42 n.2), argued for an upward departure based on criminal history (A. 63–64), and advocated for a sentence within the range of 51 to 63 months' imprisonment (A. 64–67).

Simmons disagreed. In terms of the Guidelines, Simmons argued that his prior conviction for criminal possession of a controlled substance in the third degree under N.Y. PENAL LAW § 220.16(1) did not qualify as a "controlled substance offense" because Section 220.16(1) permits the prosecution of naloxegol and certain isomers of cocaine that are not federally controlled and, therefore, Section 220.16(1) is

---

[3] The calculations in the final revised Presentence Report differ because they reflect Judge Castel's findings and revision to the Presentence Report.

8

categorically broader than the CSA. (A. 15–27, 69–80).[4] Resisting the Government's request for an upward departure (A. 81–82), Simmons argued that the applicable advisory Guidelines range was 27 to 33 months' imprisonment (A. 28, 82), and advocated for a 20-month sentence (A. 34, 82).

On December 14, 2021, the parties appeared for Simmons's sentencing. At the sentencing hearing, Judge Castel first determined that N.Y. PENAL LAW § 220.16(1) was categorically broader than the CSA based on the cocaine isomer argument and, as a result, Simmons' prior felony drug conviction did not qualify as a controlled substance offense, and Simmons's applicable Guidelines range was 27 to 33 months' imprisonment, as Simmons had sought. (A. 95–96).[5]

Judge Castel then heard from Simmons's counsel, who emphasized the conditions of Simmons's childhood, Simmons's mental illness, the conditions of Simmons's confinement, and that, because of Simmons's mental illness, he "carried a gun believing people were out there ready to kill him." (A. 98–105). Simmons spoke, seeking leniency, and talking of his love for his family. (A. 105–10). The Government indicated that,

---

[4] The Government's sentencing letter explained, at length, why this argument was misplaced. (A. 47–63).

[5] In doing so, Judge Castel incorporated his findings on the cocaine isomer issue at the sentencing in *United States v. Derell Louissaint*, 20 Cr. 685 (PKC), Dkt. 35 (S.D.N.Y. Nov. 17, 2021). (A. 88–90, 95–96).

9

to the extent that Simmons needed mental health treatment, "we hope that the treatment would be available in the BOP," and emphasized the dangers inherent in Simmons's crime and history, as well as arguing that "he ran to escape punishment, to hide his gun and ammunition." (A. 110–12).

"[B]ased on the need to get this individual the proper medical care and to protect the public from further crimes of this defendant, and taking account of the other 3553(a) factors which I have mentioned" (A. 116), Judge Castel sentenced Simmons to 48 months' imprisonment, to be followed by three years' supervised release, imposing special conditions of supervised release that addressed Simmons's mental and physical health issues (A. 123–28).

Judge Castel explained the reasons for his sentence in detail. (A. 112–16). Judge Castel noted the "frightening and disturbing" nature of the video of Simmons's offense, opining that "it's miraculous that there wasn't gunfire on the streets as a result of this episode." (A. 113). Judge Castel discussed Simmons's lengthy criminal history, including "14 orders of protection issued in favor of two women," and Simmons's statement to his doctor that "I hear voices that tell me to kill people and kill myself." (A. 114). Judge Castel also exhibited sympathy for Simmons's upbringing, mental and physical illnesses, suicidal ideations, and conditions of confinement, summarizing it simply: "[i]t's a sad record." (A. 114–15). But as Judge Castel explained:

> [Section] 3553(a) counsels that I take account of the seriousness of the offense and impose a sentence that promotes

10

>respect for law and provides just punish-
>ment; adequately deters others. Here,
>there's a very important consideration,
>and that is protecting the public from fur-
>ther crimes of this defendant and also
>providing the defendant with needed
>medical care in the most effective man-
>ner. These all come together in the case
>of Mr. Simmons. He desperately needs
>proper mental health treatment to get
>him on the right track when he is re-
>leased from incarceration.

(A. 115). Accordingly, Judge Castel "conclude[d] that a
sentence of 48 months' imprisonment, three years su-
pervised release, . . . and a special assessment of $100
is sufficient but not greater than necessary to achieve
the purposes of section 3553(a)." (A. 116). Simmons did
not object "to the proposed sentence or the statements
of reasons for that sentence." (A. 116). Having ex-
plained the "desparate[] need[]" for "proper mental
health treatment to get [Simmons] on the right track
when he is released from incarceration" (A. 115),
Judge Castel "recommend[ed] that the Bureau of Pris-
ons determine the proper medical and mental health
treatment for Mr. Simmons while he is incarcerated,"
and imposed, as special conditions of supervised re-
lease, participation in mental health treatment and
continued use of prescription medication. (A. 118–19).

11

**A R G U M E N T**

**POINT I**

**Section 922(g)(9) Is Constitutional**

Simmons viciously beat his infant daughter's mother while she was holding their child, and pleaded guilty to assault in the third degree, in violation of N.Y. PENAL LAW § 120.00(1), a misdemeanor. Accordingly, when Simmons carried and tried to hide a .380-caliber Kel-Tec model P-3AT pistol, he violated 18 U.S.C. § 922(g)(9), which makes it "unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to . . . possess in or affecting commerce, any firearm or ammunition."

Simmons argues, for the first time on appeal, that Section 922(g)(9) violates his Second Amendment right to bear arms. (Supp. Br. 6–19). This claim, which is based on the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), is meritless. Those convicted of violent crimes, like Simmons, are not among "the people" that the Second Amendment protects because they are not law-abiding, responsible citizens. Section 922(g)(9) is, moreover, a presumptively lawful measure because it merely closes a dangerous loophole in the traditional prohibition of firearm possession by convicted felons. Finally, Section 922(g)(9) is consistent with the Nation's historical tradition of firearm regulation. Thus, the District Court did not err, let alone plainly err, by failing to dismiss the Indictment *sua sponte*.

12

### A. Applicable Law

#### 1. Standard of Review

Typically, this Court "review[s] de novo a district court's determination that the application of a law does not violate the Second Amendment." *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018). However, as Simmons concedes (Br. 6–7), where, as here, the appellant did not challenge the statute below, the Court reviews for plain error. FED. R. CRIM. P. § 52(b); *see also United States v. Le*, 902 F.3d 104, 109 (2d Cir. 2018) (unpreserved claim that statute is unconstitutional is reviewed for plain error). This standard requires an appellant to demonstrate that: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Moore*, 975 F.3d 84, 90 (2d Cir. 2020). "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007); *see also Puckett v. United States*, 556 F.3d 129, 135 (2d Cir. 2009) ("Meeting all four prongs is difficult, as it should be."). The burden is on the appellant to establish plain error. *United States v. Dussard*, 967 F.3d 149, 155 (2d Cir. 2020).

#### 2. Section 922(g)(9)

It is "unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to . . . possess in or affecting commerce, any

13

firearm or ammunition." 18 U.S.C. § 922(g)(9). Congress enacted Section 922(g) to close what it referred to as a "dangerous loophole": for a variety of reasons, domestic abusers—who presented extraordinary risks —were often convicted of misdemeanors rather than felonies. *United States v. Hayes*, 555 U.S. 415, 426 (2009) (quoting 142 Cong. Rec. 22986 (1996) (statement of Sen. Lautenberg)). As the Supreme Court explained:

> This country witnesses more than a million acts of domestic violence, and hundreds of deaths from domestic violence, each year. . . . Domestic violence often escalates in severity over time, . . . and the presence of a firearm increases the likelihood that it will escalate to homicide . . . , *see* . . . Campbell *et al.*, Assessing Risk Factors for Intimate Partner Homicide, DOJ, Nat. Institute of Justice J., No. 250, p. 16 (Nov. 2003) ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed"). "[A]ll too often," as one Senator noted during the debate over § 922(g)(9), "the only difference between a battered woman and a dead woman is the presence of a gun." 142 Cong. Rec. 22986 (1996) (statement of Sen. Wellstone).

Congress enacted § 922(g)(9), in light of these sobering facts, to "close [a] dangerous loophole" in the gun control laws:

14

> While felons had long been barred from possessing guns, many perpetrators of domestic violence are convicted only of misdemeanors.

*United States v. Castleman*, 572 U.S. 157, 160–61 (2014); *see also*, *e.g.*, *Voisine v. United States*, 579 U.S. 686, 689 (2016) ("Congress enacted § 922(g)(9) some 20 years ago to close a dangerous loophole in the gun control laws. . . . An existing provision already barred convicted felons from possessing firearms. . . . But many perpetrators of domestic violence are charged with misdemeanors rather than felonies, notwithstanding the harmfulness of their conduct. . . . And firearms and domestic strife are a potentially deadly combination. . . . Accordingly, Congress added § 922(g)(9) to prohibit any person convicted of a 'misdemeanor crime of domestic violence' from possessing any gun or ammunition with a connection to interstate commerce.").

### 3. The Second Amendment and Prohibitions on Criminals Possessing Firearms

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects "the right of *law-abiding*, responsible citizens to use arms in defense of hearth and home." *Id.* at 635 (emphasis added). At the same time, the Court emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other regulations. *Id.* at 626-27; *see also id.* at 631 ("Before this Court petitioners have stated that 'if the handgun ban is struck down and

15

respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified,' by which they apparently mean if he is *not a felon* and is not insane." (emphasis added)). As the Court noted, it "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26. Two years later, the Court "repeat[ed] th[e] assurances" that it had "made . . . clear" in *Heller*." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (plurality).

Following *Heller* and *McDonald*, the Courts of Appeals, including this Court, uniformly rejected Second Amendment challenges to 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms by convicted felons. *E.g.*, *United States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013). The Courts of Appeals likewise uniformly rejected Second Amendment challenges to Section 922(g)(9), the statute at issue in this case. *E.g.*, *United States v. Booker*, 644 F.3d 12, 26 (1st Cir. 2011); *United States v. Staten*, 666 F.3d 154, 168 (4th Cir. 2011); *Stimmel v. Sessions*, 879 F.3d 198, 211 (6th Cir. 2018); *United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010); *United States v. Chovan*, 735 F.3d 1127, 1130 (9th Cir. 2013); *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010).

### 4. *Bruen*

As courts applied *Heller* and *McDonald*, different methodological approaches emerged. In some cases, courts rejected Second Amendment claims based on the Supreme Court's reassurances in *Heller* and *McDonald* regarding the lawfulness of certain

16

regulations. *See, e.g.*, *Bogle*, 717 F.3d at 281–82 (reject-
ing challenge to 18 U.S.C. § 922(g)(1)); *Heller v. Bed-
ford Cent. Sch. Dist.*, 665 F. App'x 49, 54 (2d Cir. 2016)
(rejecting challenge to 18 U.S.C. § 922(g)(4)); *White*,
593 F.3d at 1205-06 (rejecting challenge to Section
922(g)(9)). In other cases, courts "coalesced around a
'two-step' framework for analyzing Second Amend-
ment challenges that combines history with means-
end scrutiny," *i.e.*, whether "the regulation promotes
an important [governmental] interest." *Bruen*, 142
S. Ct. at 2125-26; *see, e.g.*, *United States v. Perez*, 6
F.4th 448, 453–56 (2d Cir. 2021) (rejecting challenge
to 18 U.S.C. 922(g)(5)); *Jimenez*, 895 F.3d at 236-38
(rejecting challenge to 18 U.S.C. § 922(g)(6)).

In *Bruen*, the Supreme Court considered a New
York State law that provided for a discretionary
"proper cause" licensing regime to carry a firearm out-
side the home, which this Court upheld using the
means-end framework. 142 S. Ct. at 2122–23, 2125.
The Supreme Court reversed, rejecting the means-end
test, *id.* at 2126-27, and reaffirming "*Heller*'s method-
ology centered on constitutional text and history," *id.*
at 2128-29. Thus, "the standard for applying the Sec-
ond Amendment is as follows: When the Second
Amendment's plain text covers an individual's con-
duct, the Constitution presumptively protects that
conduct. The government must then justify its regula-
tion by demonstrating that it is consistent with the
Nation's historical tradition of firearm regulation." *Id.*
at 2129-30.

In assessing whether the Second Amendment's text
covers an individual's conduct, a court must consider

17

the three "textual elements" of the Second Amend-
ment's "operative clause," *i.e.*, "the right of the people
to keep and bear Arms, shall not be infringed." *Id.* at
2134. First, the individual must be "part of 'the people'
whom the Second Amendment protects." *Id.* Second,
the weapons at issue must be "[a]rms" within the
meaning of the Second Amendment—"weapons 'in
common use' today for self-defense." *Id.* (quoting *Hel-
ler*, 554 U.S. at 627). Third, the individual's "proposed
course of conduct" must be something "the plain text
of the Second Amendment protects," *i.e.*, the conduct
must constitute "keep[ing]" or "bear[ing]" arms. *Id.* at
2134-35.

If the Second Amendment's text covers an individ-
ual's conduct, "[t]he government must demonstrate
that the regulation is consistent with this Nation's his-
torical tradition of firearm regulation." *Id.* at 2126.
This historical inquiry "will often involve reasoning by
analogy." *Id.* at 2132. In determining whether a mod-
ern regulation and a historical regulation are "rele-
vantly similar," courts should consider "at least two
metrics: how and why the regulations burden a law-
abiding citizen's right to armed self-defense," *i.e.*,
"whether modern and historical regulations impose a
comparable burden on the right of armed self-defense
and whether that burden is comparably justified." *Id.*
at 2132-33. Such "analogical reasoning under the Sec-
ond Amendment is neither a regulatory straightjacket
nor a regulatory blank check." *Id.* at 2133. The inquiry
"requires only that the government identify a well-es-
tablished and representative historical *analogue*, not
a historical *twin*." *Id.* (emphasis in original). Thus,
"even if a modern-day regulation is not a dead ringer

18

for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

## B. Discussion

Neither the Supreme Court nor this Court has previously addressed the constitutionality of Section 922(g)(9) under the Second Amendment. Every Court of Appeals to consider the issue has held that Section 922(g)(9) is constitutional, and no Circuit has yet revisited the question since *Bruen*.[6] Because Simmons's claim is not "clear under current law," the District Court did not commit plain error by failing to dismiss the Indictment *sua sponte*. *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) (no plain error "where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court").

Indeed, there was no error at all. The Second Amendment does not guarantee a convicted domestic abuser, such as Simmons, the right to possess a firearm. A convicted violent criminal like Simmons law is not a law-abiding, responsible citizen and thus is not among "the people" protected by the Second Amendment. Furthermore, Section 922(g)(9) is presumptively

_____

[6] Several district courts have rejected Second Amendment challenges to Section 922(g)(9) after *Bruen*. *United States v. Anderson*, No. 21 Cr. 13, 2022 WL 10208253 (W.D. Va. Oct. 17, 2022); *United States v. Nutter*, No. 21 Cr. 142, 2022 WL 3718518 (S.D. W. Va. Aug. 29, 2022); *United States v. Jackson*, No. 22 Cr. 59, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022).

19

lawful because it simply closes a dangerous loophole in the traditional prohibition of possession of firearms by convicted felons. And Section 922(g)(9) is consistent with the historical tradition of firearm regulation.

## 1. Section 922(g)(9) Imposes No Burden on Law-Abiding, Responsible Citizens

*Bruen* teaches that a threshold inquiry is whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. One "element[]" of that textual inquiry is whether the individual is "part of 'the people' whom the Second Amendment protects." *Id.* at 2134. By its terms, Section 922(g)(9) applies only to those convicted of committing certain violent crimes. Violent, convicted criminals are not among "the people" protected by the Second Amendment, and thus Section 922(g)(9) does not burden any Second Amendment right.

The Supreme Court has made clear that "the people" protected by the Second Amendment are law-abiding, responsible citizens. In *Heller*, the Court recognized that "the right . . . to use arms in defense of hearth and home" belonged to "law-abiding, responsible citizens." 554 U.S. at 635; *see also id.* (proceeding on assumption that respondent "is not disqualified from the exercise of Second Amendment rights"). This Court has understood *Heller* to impose "an implicit limitation on the exercise of the Second Amendment right to bear arms for lawful purposes and a limitation on ownership to that of law-abiding, responsible citizens." *United States v. Bryant*, 711 F.3d 364, 369 (2d Cir. 2013). The Supreme Court confirmed that

20

understanding in *Bruen*, where the petitioners were "ordinary, law-abiding, adult citizens," 142 S. Ct. at 2134, and the Court repeatedly defined the Second Amendment as limited to "law-abiding" citizens, *id.* at 2122, 2125, 2131, 2133, 2134, 2135 n.8, 2138 & n.9, 2150, 2156.

The *Bruen* Court's approval of "shall-issue" licensing regimes further reinforces that the Second Amendment protects law-abiding, responsible citizens.[7] Shall-issue regimes "often require applicants to undergo a background check or pass a firearms safety course," yet they generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635); *see id.* at 2162 (Kavanaugh, *J.*, joined by Roberts, *C.J.*, concurring) (explaining that shall-issue regimes "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements," and "are constitutionally permissible"). In reaching that conclusion, the Court had no need to analyze whether there were historical analogues of

---

[7] A "shall issue" regime is one in which "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements." *Bruen*, 142 S. Ct. at 2123. By contrast, a "may issue" regime vests "authorities [with] discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria." *Id.* at 2124.

21

modern shall-issue regulations because they simply
help identify those individuals who are not law-abid-
ing, responsible citizens and thus are not among "the
people" protected by the Second Amendment—and
then permissibly preclude those individuals from be-
ing licensed to possess firearms.

Like those excluded by shall-issue regimes ap-
proved in *Bruen*, Simmons is not a law-abiding, re-
sponsible citizen. Having been convicted of violating
Section 922(g)(9), he has, by definition, previously
been convicted of committing a misdemeanor crime of
domestic violence—an offense that "has, as an ele-
ment, the use or attempted use of physical force, or the
threatened use of a deadly weapon." 18 U.S.C.
§ 921(a)(33)(A)(ii). Simmons has, in simple terms,
been adjudicated a violent criminal and thus has
placed himself outside of "the people" whom the Sec-
ond Amendment protects. The circumstances of Sim-
mons's case confirm this conclusion. Simmons vi-
ciously beat his infant daughter's mother while she
was holding their child, and he pleaded guilty to com-
mitting assault by "inten[ding] to cause physical in-
jury to another person" and "caus[ing] such injury to
such person or to a third person." N.Y. PENAL LAW
§ 120.00(1). By any measure, he is neither "law-abid-
ing" nor "responsible" for purposes of the Second
Amendment. And because Section 922(g)(9) solely reg-
ulates the possession of guns by adjudicated violent

22

criminals, it does not burden any Second Amendment right.[8]

Simmons asserts that because he told the police that he could use a gun to defend himself, his "conduct in possessing a handgun that day, in self-defense, was protected by the Second Amendment." (Supp. Br. 13). Setting aside whether Simmons actually possessed the firearm for self-defense, this contention ignores the repeated admonition of *Heller* and its progeny that the Second Amendment protects law-abiding, responsible citizens. It also ignores *Bruen*'s teaching that the Second Amendment has three distinct "textual elements" that must be considered, only one of which is whether the individual's "proposed course of conduct" is something "the plain text of the Second Amendment protects." 142 S. Ct. at 2134-35. Courts must also consider whether the individual is "part of 'the people' whom

––––––––––

[8] Simmons further demonstrated that he was not law abiding when he chose to flout Section 922(g)(9). The *Bruen* petitioners and *Heller* respondent sought permits and filed suit when they were denied. Simmons likewise could have challenged the constitutionality of Section 922(g)(9) in court without first illegally possessing a firearm—as others subject to Section 922(g)(9) have done. *E.g.*, *Stimmel*, 879 F.3d at 201. Or he could have taken steps to possess a firearm legally. *See*, *e.g.*, 18 U.S.C. § 921(a)(33)(B)(ii) (setting forth the requirements for a convicted domestic abuser to reestablish his right to possess a firearm). He did not do so; rather, he chose to break the law, thus compounding his previous failure to abide by the law.

23

the Second Amendment protects," *id.* at 2134, and Simmons makes no claim that he is a law-abiding, responsible citizen under *Heller* and *Bruen*. *See Bryant*, 711 F.3d at 369 (recognizing that "lawful purposes" and "law-abiding, responsible citizens" are distinct requirements under *Heller*). Furthermore, Simmons's argument would, if accepted, undermine the very shall-issue regimes of which *Bruen* approved, because an individual could avoid background checks and other licensing requirements with a conclusory assertion that he needs the firearm for self-defense. *See* 142 S. Ct. at 2138 n.9.

Individuals convicted of misdemeanor crimes of violence, including Simmons, are not among "the people" whom the Second Amendment protects. Thus, this Court can reject Simmons's Second Amendment claim on that basis alone without the need for further analysis.

## 2. Even If the Second Amendment Applies, Section 922(g)(9) Is Constitutional

Assuming the Second Amendment applies, Section 922(g)(9) is constitutional—both because it is "presumptively lawful" under *Heller* and *McDonald* and because it "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30.

### a. Section 922(g)(9) Is Presumptively Lawful Under *Heller*

As an initial matter, Section 922(g)(9) "fits comfortably among the categories of regulations that *Heller*

24

suggested would be 'presumptively lawful.'" *Booker*, 644 F.3d at 24. The Supreme Court could not have been clearer that nothing in its jurisprudence should be read as upsetting "permissible . . . exceptions" to the Second Amendment, such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626, 635; *see also McDonald*, 561 U.S. at 786 (plurality). This Court agreed, upholding the federal felon-in-possession statute on the basis of the Supreme Court's reassurances. *Bogle*, 717 F.3d at 281–82. Moreover, the Supreme Court noted that the list of "presumptively lawful regulatory measures" it identified were only "examples" and "d[id] not purport to be exhaustive." *Heller*, 554 U.S. at 627 n.26. The Supreme Court's approval of such prohibitions extends equally to convicted domestic abusers, like Simmons, as such laws were simply meant to close "a dangerous loophole" in the traditional prohibition of firearm possession by convicted felons, whereby those who were at least equally as dangerous as felons were convicted of domestic violence misdemeanors. *Castleman*, 572 U.S. at 160–61; *Voisine*, 579 U.S. at 689.

The Supreme Court's admonitions remain good law. *Bruen*, by its own terms, *reinforced Heller* and *McDonald*, and did not overrule them. Indeed, Simmons concedes that *Bruen* simply reinforced *Heller* and *McDonald*, rather than creating a new test. (Supp. Br. 10–11). Furthermore, as the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* were supported by history. *See Bruen*, 142 S. Ct. at 2128 (explaining that in *Heller*, the Court "relied on the historical

25

understanding of the [Second] Amendment to demark the limits on the exercise of that right"); *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, *J.*, joined by Thomas and Gorsuch, *JJ.*, dissenting) (explaining that *Heller* and *McDonald* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals"); *Heller*, 554 U.S. at 626, 635 (acknowledging that "permissible" regulations, including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill," were supported by "historical analysis" and "historical justifications"). It would therefore make little sense to conclude that *Bruen* meant, *sub silentio*, to discard *Heller*'s and *McDonald*'s repeated admonitions that felon-disarmament—and, by extension, domestic-abuser-disarmament—is wholly consistent with the Second Amendment. *See Heller*, 554 U.S. at 626, 631; *McDonald*, 561 U.S. at 786 (plurality).

Indeed, eight members of the *Bruen* Court have made clear that *Bruen* did *not* upend the Court's prior recognition of presumptively lawful regulations. In *Bruen* itself, six Justices took pains to emphasize that the decision did nothing to upset *Heller*'s and *McDonald*'s reassurances. *See* 142 S. Ct. at 2157 (Alito, *J.*, concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, *J.*, joined by Roberts, *C.J.*, concurring) ("Properly interpreted, the Second

26

Amendment allows a 'variety' of gun regulations," including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626)); *id.* at 2189 (Breyer, *J.*, joined by Sotomayor and Kagan, *JJ.*, dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding."). Furthermore, two years earlier, Justice Thomas—who authored the majority opinion in *Bruen*—and Justice Gorsuch "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *City of New York*, 140 S. Ct. at 1540–41 (Alito, *J.*, joined by Thomas and Gorsuch, *JJ.*, dissenting). In short, eight of the nine members of the *Bruen* Court have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes and, by extension, domestic-abuser-disarmament statutes.

In a parenthetical, Simmons dismisses the Supreme Court's reassurances in *Heller* and *McDonald* as "dicta." (Supp. Br. 9). But the Supreme Court's express limitations of its own opinions—which help couch the boundaries of the test in *Heller* that was repeated in *McDonald* and clarified in *Bruen*—were not dicta. *See, e.g., United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (explaining that "the Court's language about certain long-standing restrictions on gun possession is [not] dicta" because "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings");

27

*United States v. Huet*, 665 F.3d 588, 600 n.11 (3d Cir. 2012) ("Although some of our sister circuits have classified the 'presumptively lawful' language in *Heller* as dicta, . . . we disagree."); *Binderup v. Att'y Gen.*, 836 F.3d 336, 359 n.3 (3d Cir. 2016) (Hardiman, *J.*, concurring in part) ("*Heller*'s list constitutes a limitation on the scope of its holding and does not qualify as dicta"); *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) ("to the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by *law-abiding* and *qualified* individuals, it is not dicta").[9] However, even if it were dicta, it must still "be given considerable weight and [cannot] be ignored in the resolution of the" issue before this Court. *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975); *see also, e.g.*, *United States v. Colasuonno*, 697 F.3d 164, 178–79 (2d Cir. 2012) (acknowledging that it is the "usual obligation to accord great deference to Supreme Court dicta" except in certain circumstances, such as when

_____

[9]  Notably, in *Bruen*, Justice Kavanaugh—joined by Chief Justice Roberts—"wr[o]te separately to underscore two important points about the limits of the Court's decision," one of which was that "the Second Amendment allows a 'variety' of gun regulations," including prohibitions on convicted felons possessing firearms. *Bruen*, 142 S. Ct. at 2161–62 (Kavanaugh, *J.*, concurring). Without Justice Kavanaugh and Chief Justice Roberts, the *Bruen* opinion would not have commanded a majority; accordingly, even if *Heller*'s limitation was once arguably dicta, it is controlling after *Bruen*.

28

Congress has "removed or weakened the conceptual underpinnings" of a decision).

Simmons also dismisses this Court's holding in *Bogle*, saying that it is "based solely on dicta in *Heller* and *McDonald*" and that "*Bruen* resoundingly rejected this framework." (Supp. Br. 9–10). However, as discussed above, the *Heller*/*McDonald* limitation was not dicta—and, in fact, was reinforced in *Bruen*—and, in any event, when this Court adopted it as the core basis of its holding in *Bogle*, it became binding in this Circuit. Moreover, *Bruen* did not "reject[ *Bogle*'s] framework"; rather, *Bogle* adopted *Heller*'s own logic and did not employ the improper means-end test rejected by *Bruen*. Nothing about *Bruen* undermined this Court's holding in *Bogle*, which is still controlling in this Court.

Because Section 922(g)(9) simply closes a dangerous loophole in the traditional prohibition of firearm possession by convicted felons, there is "no reason to exclude [it] from the list of longstanding prohibitions on which *Heller* does not cast doubt." *White*, 593 F.3d at 1206.

### b. Section 922(g)(9) Is Consistent with the Nation's Historical Tradition of Firearm Regulation

Section 922(g)(9) is also consistent with the Nation's historical tradition of firearm regulation. There is a longstanding tradition of prohibitions on the possession of arms by criminals and other classes of individuals deemed to be dangerous. Such prohibitions are "well-established and representative historical

29

analogue[s]," and Section 922(g)(9) is "relevantly similar" in that it "impose[s] a comparable burden on the right of armed self-defense" and "is comparably justified." *Bruen*, 142 S. Ct. at 2132-33 (emphasis removed).

The right to keep and bear arms, as historically understood, did not extend to those who posed a danger to the state or the community. In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom.'" Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). And "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law,'" so long as it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (emphasis removed) (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259-61 (detailing history). Similarly in America, the colonies (and later the states) enacted statutes that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people."[10] *Bruen*, 142 S. Ct. at 2145. As *Bruen*

_____

[10] *See, e.g.*, Acts and Laws of His Majesty's Province of New Hampshire in New England 17 (1771) (statute enacted 1701); Collection of All Such Acts of the General Assembly of Virginia 33 (1794) (statute enacted

30

observed, such statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)).

Moreover, there was ample evidence that the Framers understood that the state could determine that classes of people were sufficiently dangerous that they could not be armed.[11] For example, the states precluded gun ownership by Catholics and by classes of people who refused to take oaths to the state, such as Quakers. *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment); Robert H. Churchill, *Gun Regul., the Police Power, & the Right to Keep Arms in Early Am.: The Legal Context of the Second Amend.*, 25 LAW & HIST. REV. 139, 157–60 (2007). And they precluded the bearing of arms by those deemed not to have white society's interests at heart, like Native Americans and slaves. *See Perez*, 6 F.4th at 462 (Menashi, J., concurring in the judgment); *Nat'l Rifle*

—————

1786); 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807 p. 653 (1807) (statute enacted Jan. 29, 1795); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99-100 (1836) (statute enacted 1801).

[11] A database of laws and regulations either disarming or preventing the provision of firearms to various classes of individuals deemed dangerous is available at *https://firearmslaw.duke.edu/repository/search-the-repository/*.

31

*Ass'n of Amer. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *Kanter v. Barr*, 919 F.3d 437, 457–58 (7th Cir. 2019) (Barrett, *J.*, dissenting); Robert H. Churchill, *Gun Regul.*, 25 LAW & HIST. REV. 139, 157–60; Joyce Lee Malcolm, *To Keep and Bear Arms* at 140–41 (1994). Or, as then-Judge Barrett explained: "In sum, founding-era legislatures categorically disarmed groups of people they judged to be a threat to the public safety." *Kanter*, 919 F.3d at 458 (Barrett, *J.*, dissenting).[12] While some of these classifications—such as those based on race or religion—are abhorrent and of course "would be unconstitutional today" under other constitutional provisions, *Drummond v. Robinson Township*, 9 F.4th 217, 228 n.8 (3d Cir. 2021), they nevertheless show that the Framers understood that legislatures could make such judgments to categorically disarm groups of people deemed to be dangerous.

In addition, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010); *see also, e.g.*, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 491–92 (2004);

--------

[12] Of course, "dangerousness was one reason to restrict firearm possession, but it hardly was the only one." *Folajtar v. Attorney General of the U.S.*, 980 F.3d 897, 909 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 2511 (2021).

32

Saul Cornell, *"Don't Know Much about History": The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002); David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 MICH. L. REV. 588, 626–27 (2000); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983); *United States v. Carpio–Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) ("[F]elons were excluded from the right to arms because they were deemed unvirtuous."); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) ("[T]he right to bear arms does not preclude laws disarming . . . unvirtuous citizens (*i.e.*, criminals)."); *United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) ("In the parlance of the republican politics of the time, these limitations were sometimes expressed as efforts to disarm the 'unvirtuous.' ").

The Second Amendment thus incorporates a "common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible," and it " 'does not preclude laws disarming the unvirtuous (*i.e.* criminals).' " *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143, 146 (1986)). That understanding is reflected in the background of the Second Amendment itself. "*Heller* identified . . . as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents."

33

*Skoien*, 614 F.3d at 640 (quoting *Heller*, 554 U.S. at 604). That report expressly recognized the permissibility of imposing a firearms disability on convicted criminals, stating that "citizens have a personal right to bear arms '*unless for crimes committed*, or real danger of public injury.'" *Id.* (emphasis added) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) ("Schwartz")).[13]

The fact that this type of explicit language was not ultimately included in the Second Amendment is of little moment: it was not included because such limitations were reasonably understood to be inherent in the right to bear arms at the time. As Justice Cooley wrote in 1868, certain classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious

---

[13]  The Pennsylvania Minority was not alone in its understanding of the limitations of a right to bear arms. Samuel Adams proposed that the right to bear arms be protected by stating: "And that the said Constitution be never construed to authorize Congress to . . . prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *See* 2 Schwartz at 675, 681 (emphasis added). Similarly, New Hampshire's recommendation for the bill of rights included this right: "Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*." See 1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891) (emphasis added).

grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).[14] The *Heller* court afforded Justice Cooley great deference, as his treatise was "massively popular" and written by "[t]he most famous" late-nineteenth century scholar. 554 U.S. at 616. This is why one scholar

_____

[14] Available at *https://heinonline.org/HOL/Page?handle=hein.beal/tcl1868&id=1&collection=beal*. While Justice Cooley did not discuss the right to bear arms in particular in his discussion of civic rights, the principle remains equally applicable: by committing crimes such as felonies or domestic violence misdemeanors, citizens forfeit certain civic rights. *Cf. Binderup v. Barr*, 836 F.3d 336, 349 (3d Cir. 2016) (en banc) ("[P]ersons who have committed serious crimes forfeit the right to possess firearms [in] much the way 'they forfeit other civil liberties.' "); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, *J.*, concurring in most of the judgment) (explaining the "historically grounded and sensible" rule that "[l]egislatures have authority (1) to impose lifetime gun-possession bans on felons as a safety measure *and as a legitimate consequence of a felony conviction* and (2) to keep weapons out of the hands of those who, due to psychiatric challenges, pose a risk to themselves or others." (emphasis added)); *see also Heller*, 554 U.S. at 635 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.").

35

—writing in support of the individual right recognized
by *Heller*—concluded that limitations on criminals'
possession of firearms was well-established, even if not
stated expressly in the constitutional text: "By the
same token, Samuel Adams and the drafters of the
New Hampshire proposal did not object to the lack of
an explicit exclusion of criminals from the individual
right to keep and bear arms, *because this too was un-
derstood*." Stephen P. Halbrook, *The Founders' Second
Amendment* 273 (2008) (emphasis added); *see also
McDonald*, 561 U.S. at 768-69 (citing Halbrook, *The
Founders' Second Amendment* 171–278 in discussing
views of "those who drafted and ratified the Bill of
Rights" regarding "[t]he right to keep and bear arms").

In light of the historical limitation of the Second
Amendment to "law-abiding" citizens, which under-
standing was emphasized repeatedly by the Supreme
Court, *see Heller*, 554 U.S. at 625, 635; *McDonald*, 561
U.S. at 790, *Bruen*, 142 S. Ct. at 2122, 2125, 2131,
2133, 2134, 2138, 2150, 2156, the Second Amendment
does not even presumptively protect the armament of
felons or other dangerous criminals. *See, e.g., United
States v. Marzzarella*, 614 F.3d 85, 91–92 (3d Cir.
2010) ("the specific language chosen by the [*Heller*]
Court refers to 'prohibitions' on the possession of fire-
arms by felons and the mentally ill. . . . The endorse-
ment of prohibitions as opposed to regulations, whose
validity would turn on the presence or absence of cer-
tain circumstances, suggests felons and the mentally
ill are disqualified from exercising their Second
Amendment rights." (quoting *Heller*, 554 U.S. at 626));
*Medina v. Whitaker*, 913 F.3d 152, 154 (D.C. Cir. 2019)
("felons are not among the law-abiding, responsible

36

citizens entitled to the protections of the Second
Amendment"); *cf. Hamilton v. Pallozzi*, 848 F.3d 614,
626 (4th Cir. 2017) ("Where the sovereign has labeled
the crime a felony, it represents the sovereign's deter-
mination that the crime reflects 'grave misjudgment
and maladjustment . . . .' A felon cannot be returned to
the category of 'law-abiding, responsible citizens' for
the purposes of the Second Amendment . . . unless the
felony conviction is pardoned or the law defining the
crime of conviction is found unconstitutional or other-
wise unlawful.").

Furthermore, a person convicted "of the higher
kinds of offense"—treason, "felonies of all sorts
whether clergyable or not, self-murder or felony *de se*,
petit larceny, standing mute, and the . . . offences of
striking, &c. in Westminster-hall" traditionally would
be liable to forfeit *all* of his personal property, and
would be subject to capital punishment. 5 William
Blackstone, COMMENTARIES *386–87 (St. George
Tucker ed. 1803) (1767); *see also, e.g., Medina*, 913
F.3d at 158 ("[I]t is difficult to conclude that the public,
in 1791, would have understood someone facing death
and estate forfeiture to be within the scope of those en-
titled to possess arms."); *Avery v. Everett*, 110 N.Y. 317,
324 (1888) ("By the ancient common law . . . [t]here
were three principle incidents consequent upon an at-
tainder for treason or felony, forfeiture, corruption of
blood, and an extinction of civil rights, more or less

complete, which was denominated civil death.").[15] Or, as one scholar explained:

> The constitutionality of [bans on felon possession] cannot seriously be questioned . . . [because f]elons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. We may presume that persons confined in gaols awaiting trial on criminal

---

[15] These included crimes that were not necessarily violent by their nature: at the founding, crimes analogous to fraud—including forgery, embezzlement, and counterfeiting—were often classified as felonies punishable not just by disarmament, but by death. The First Congress treated "forgery, [dealing in] forged securities, [and] counterfeiting" as capital crimes, *Folajtar v. Barr*, 980 F.3d 897, 905 (3d Cir. 2020) (first alteration in original) (quoting John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 56–57 (2012)); several states, including New York and Maryland, subjected forgers to the death penalty; and contemporary English law similarly categorized "counterfeiting" and "embezzlement" as punishable by execution, *Medina*, 913 F.3d at 158 (quotation marks omitted). "[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Id.*

38

charges were also debarred from the possession of arms.

Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. at 266. A perfect analogue is made more difficult by the shifting meaning of the concept of a "felony." *See* Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 CLEV. ST. L. REV. 461, 465 (2009).[16] However, even as capital punishment became less universal, and civil death was no longer mandatory at common law, states retained the ability to impose civil death for convictions of those felonies they saw fit. *See* Note, *Civil Death Statutes—Medieval Fiction in a Modern World*, 50 HARV. L. REV. 968, 968 n.1 (1937) (listing civil death statutes from 18 states).[17]

———————

[16] The number of felonies at common law was quite limited: murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny. *See* Tress, *Unintended Collateral Consequences*, 57 CLEV. ST. L. REV. at 464 (citing Francis Wharton, *Treatise on the Criminal Law of the United States* 1 (Philadelphia, James Kay, Jun. & Brother 1846)). However, "legislatures quickly began to expand the list." *Folajtar*, 980 F.3d at 904.

[17] Indeed, in 1799, New York was the first state to enact a civil death statute in order to bridge the gap of the changing laws about the punishment of felonies. N.Y. Laws 1799, c. 57 (cited in *Civil Death Statutes*, 50 HARV. L. REV. at 968 n.4).

39

In short, Halbrook's conclusion that the founders "understood" that criminals could be barred from bearing arms, and so the limitation did not have to be set forth explicitly in the Second Amendment, as some states had proposed, *see The Founders' Second Amendment* at 273, is wholly supported by history. Moreover, it has not been seriously disputed until now. *Cf, Bruen*, 142 S. Ct. at 2133 (explaining that, although "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited[,] . . . we are also aware of no disputes regarding the lawfulness of such prohibitions," and, therefore, it is "settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." (emphasis in original)).

Finally, Section 922(g)(9) is "relevantly similar" to these "well-established and representative historical analogue[s]," in that it "impose[s] a comparable burden on the right of armed self-defense." *Bruen*, 142 S. Ct. at 2132-33 (emphasis removed). Both Section 922(g)(9) and the historical analogues prohibit classes of people from keeping and bearing arms. But unlike many historical regulations, Section 922(g)(9) requires significant process before someone may be found to belong within the prohibited class. *See* 18 U.S.C. § 921(a)(33)(B)(i) (describing process required to find someone to have been "convicted of a misdemeanor crime of domestic violence" under § 922(g)(9)). And it

40

allows for the possibility of removing people from the class. *See* 18 U.S.C. § 921(a)(33)(B)(ii) (allowing for removal from the prohibited class in specific circumstances such as a "pardon, expungement, or restoration of rights"). Thus, Section 922(g)(9) carefully and precisely defines the class of people whose conduct it regulates, requires process, and allows for the possibility that people may be removed from the prohibited class. It is thus narrower than many founding-era restrictions.

Section 922(g)(9) also is more than "comparably justified" relative to its historical analogues. *Bruen*, 142 S. Ct. at 2133. Compared to the racial and religious classifications of firearm prohibitions in the founding era, Congress had a far better justification classifying domestic abusers as sufficiently dangerous that they should not be armed: "The purpose of [Section 922(g)(9) is to keep firearms out of the hands of people whose past violence in domestic relationships makes them untrustworthy custodians of deadly force." *United States v. Belless*, 338 F.3d 1063, 1067 (9th Cir. 2003); *see also*, *e.g.*, *Castleman*, 572 U.S. at 160 ("When a gun was in the house, an abused woman was 6 times more likely than other abused women to be killed").[18]

───────────

[18] Between 1980 and 2008, 41.5% of female homicide victims in the United States were killed by their intimate partners (defined as spouse, ex-spouse, or boyfriend/girlfriend). Bureau of Justice Statistics, Homicide Trends in the United States, 1980-2008, 10

41

Simmons argues that Section 922(g)(9) is unconstitutional because "there does not seem to be historical evidence that domestic violence misdemeanants, specifically, have been subject to such restrictions or prohibitions." (Supp. Br. 16). This argument reflects the precise analytical error that the Supreme Court rejected in *Bruen*: "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." 142 S. Ct. at 2133 (emphasis in original). By demanding a historical twin, Simmons urges this Court not to "apply[ ] constitutional principles to novel modern conditions." *Id.* at 2134. But *Bruen* teaches that "the Second Amendment's historically fixed meaning applies to new circumstances," and thus the Second Amendment "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132.

\*     \*     \*

In sum, Congress may disarm convicted criminals such as felons and domestic abusers without running afoul of the Second Amendment. Judge Castel did not err—much less plainly err—by failing to dismiss the Indictment *sua sponte*.

———————

(Table 6) (Nov. 2011), *at* https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf.

42

## POINT II

### The District Court Miscalculated Simmons's Sentencing Guidelines

Judge Castel erred in concluding that N.Y. PENAL LAW § 220.16(1) is categorically broader than the CSA and, accordingly, that Simmons's drug conviction is not a controlled substance offense.[19]

### A.  Relevant Facts

In 2013, Simmons pleaded guilty to criminal possession of a controlled substance in the third degree, in violation of N.Y. PENAL LAW § 220.16(1). (PSR ¶ 41). Because the 2013 conviction constitutes a "controlled substance offense," U.S.S.G. § 4B1.2(b), Simmons's base offense level should have been 20, pursuant to

---

[19] The "cocaine isomer" issue discussed herein is currently before this Court—in various forms—in at least three pending appeals. *See United States v. Hodayah Johnson*, No. 19-4071 (plain error); *United States v. Minter*, No. 21-3102 (affirmative Government appeal of whether a New York State drug conviction is a "serious drug offense," pursuant to 18 U.S.C. § 924(e)(2)(A)(ii)); *United States v. Guttierrez-Campos*, No. 22-438 (affirmative Government appeal of whether a New York State drug conviction is an "aggravated felony," pursuant to 8 U.S.C. § 1101(a)(43)(B) and 18 U.S.C. § 924(c)(2)). Because of the likelihood that this issue will be resolved in one of those cases before this appeal is heard, this brief provides an abbreviated version of the Government's argument.

43

U.S.S.G. § 2K2.1(a)(4)(A), his final offense level should have been 17, and, at Criminal History Category V (PSR ¶ 51), his advisory Guidelines range should have been 46 to 57 months' imprisonment. However, Judge Castel found that Simmons's 2013 drug conviction is not a controlled substance offense. As a result, Judge Castel found that Simmons's base offense level was 14, pursuant to U.S.S.G. § 2K2.1(a)(6)(A), and, accordingly, his final offense level was 12, and his advisory Guidelines range was 27 to 33 months' imprisonment.

## B.  Applicable Law

### 1.  Standard of Review

This Court "review[s] *de novo* a district court's specific determination that a prior offense was a controlled substance offense, as defined by U.S.S.G. § 4B1.2." *United States v. Townsend*, 897 F.3d 66, 69 (2d Cir. 2018).

### 2.  The Categorical Approach and Cocaine Isomers

A controlled substance offense includes "an offense under . . . state law, punishable by imprisonment for a term exceeding one year, that prohibits the . . . possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(b). The question, therefore, was whether the offense—which prohibits the possession with intent to sell a "narcotic drug," N.Y. PENAL LAW § 220.16(1), "prohibt[ed] the . . . possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export,

44

distribute, or dispense."[20] This question is one that must be answered using the now-well-known "categorical approach." *United States v. Thompson*, 961 F.3d 545, 553–54 (2d Cir. 2020).

To violate Section 220.16(1), a defendant must "knowingly and unlawfully possess . . . a narcotic drug with intent to sell it." N.Y. PENAL LAW § 220.16(1). "Narcotic drug," in turn, "means any controlled substance listed in Schedule I(b), I(c), II(b) or II(c) other than methadone." N.Y. PENAL LAW § 220.00(7). If "narcotic drug" includes substances that are not federally controlled—the timing of the comparison is an issue discussed below—then Section 220.16(1) is categorically broader than the Controlled Substances Act (the "CSA"), and the conviction is not a controlled substance offense; conversely, if all substances controlled as "narcotic drugs" are also federally controlled, then Section 220.16(1) is categorically not broader than the CSA, and the conviction is a serious drug offense. *Townsend*, 897 F.3d at 74.

New York State law prohibits possessing with intent to sell a "narcotic drug." N.Y. PENAL LAW § 220.16(1). Relevant here, "narcotic drug" includes substances listed in New York State's Schedule II(b). N.Y. PENAL LAW § 220.00(7). New York State's

---

[20] Simmons's 2013 conviction for a violation of Section 220.16(1) was: (1) an offense under state law; and (2) punishable by imprisonment for a term exceeding one year.

45

Schedule II(b)(4) includes three different categories of substances related to cocaine:

> [1] Coca leaves and [2] any salt, compound, derivative, or preparation of coca leaves, and [3] any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances including cocaine and ecgonine, their salts, isomers, and salts of isomers . . .

N.Y. PUB. HEALTH LAW § 3306, Schedule II(b)(4). The statute does not define "isomers" or "chemically equivalent or identical."

By contrast, the CSA controls three *different* categories of substances related to cocaine:

> [1] Coca leaves . . . and [2] any salt, compound, derivative or preparation of coca leaves (including cocaine . . . and ecgonine . . . and their salts, isomers, derivatives and salts of isomers and derivatives), and [3] any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances . . . .

21 C.F.R. § 1308.12(b)(4). For the purposes of 21 C.F.R. § 1308.12(b)(4), "the term 'isomer' means any optical or geometric isomer." 21 C.F.R. § 1300.01(b).

What, then, do the statutes mean by "isomers"? Under its broadest definition, an isomer refers to all chemical compounds of the same elements in the same ratios. Cocaine is made up of seventeen carbon atoms,

twenty-one hydrogen atoms, one nitrogen atom, and four oxygen atoms, and therefore has the formula $C_{17}H_{21}NO_4$. There are other substances that are also made up of seventeen carbon atoms, twenty-one hydrogen atoms, one nitrogen atom, and four oxygen atoms, and therefore have the formula $C_{17}H_{21}NO_4$, even though they are definitively *not* cocaine, such as fenoterol, hydromorphinol, scopolamine,[21] and oxymorphol. Some of these, such as scopolamine, are clearly not controlled substances, as scopolamine is available by prescription, but are not listed on New York's list of controlled substances available by prescription. (A. 50–51 & n.12). Others, such as hydromorphinol, are separately scheduled as a controlled substance. *See* N.Y. PUB. HEALTH LAW § 3306, Schedule I(c)(12). Indeed, PubChem—a website maintained by the National Institutes of Health—returns 8,389 results when searching for compounds with the molecular formula $C_{17}H_{21}NO_4$. (A. 56).[22]

---

[21] Scopolamine is widely available as a transdermal patch to stave off motion sickness. *See https://www.webmd.com/drugs/2/drug-14032/scopolamine-transdermal/details.*

[22] There are far more isomers than those revealed on PubChem, which merely lists isomers identified on that database. For example, SciFinder—a subscription database—lists 12,271 constitutional isomers of cocaine. (A. 56 n.18). And there are many more—likely tens of thousands more—possible isomers that have not been specifically identified. (*Id.*).

47

The term "isomer" can be broken down into stereo-isomers—which are isomers in which the atoms are joined in the same order, but in a different spatial arrangement—and constitutional isomers, which are all other isomers. Stereoisomers include optical isomers and *cis/trans* isomers, which used to be known as geometric isomers.[23] There are a total of eight stereoisomers of cocaine: natural cocaine and seven non-natural stereoisomers of cocaine.

While chemists may think of the term "isomer" in the formal sense—"[o]ne of several species (or molecular entities) that have the same atomic composition (molecular formula) but different line formulae or different stereochemical formulae and hence different physical and/or chemical properties," IUPAC Gold Book, available at *https://goldbook.iupac.org/terms/*

---

[23] The term "optical isomers" is now considered to be obsolete. *See https://goldbook.iupac.org/terms/ view/O04308.* While the old term "optical isomers" typically meant what are now known as enantiomers, it also included diastereoisomers. *See id.* The term "geometric isomers" is also now considered to be obsolete; it is now referred to as "cis-trans isomers." *See https:// goldbook.iupac.org/terms/view/G02620.* The broader term "stereoisomers" includes enantiomers, diastereoisomers, and cis-trans isomers, *i.e.*, optical and geometric isomers. *See https://goldbook.iupac.org/ terms/view/S05984.* So, when the cases talk about there being eight isomers of cocaine, they are talking about natural cocaine and its seven optical and geometric isomers.

48

*view/I03289*—as discussed below, it is clear that leg-
islators and those involved in the identification and
analysis of controlled substances understood it to
mean something much narrower. However, im-
portantly, legislatures' and courts' understanding of
the meaning of "isomers" of cocaine was formed in the
context of the so-called "isomer defense," whereby a
narcotics defendant would argue that the statute only
outlawed natural cocaine—often referred to as "l-co-
caine" or "levo-cocaine," but the laboratory analysts
could not distinguish natural cocaine from its optical
isomers, known as "d-cocaine" or "dextro-cocaine."
(A. 57–59).

Importantly for this discussion, courts and lawyers
—guided by experts testifying during the days of the
isomer defense—understood the concept of cocaine iso-
mers very differently, repeatedly discussing the "eight
isomers" of cocaine: natural cocaine and its seven opti-
cal and geometric isomers. Indeed, this Court ex-
plained, in no uncertain terms: "As explained in the
cases cited above, and as confirmed essentially by the
testimony of the government's expert at trial, cocaine
has eight isomers, only one of which, L-cocaine, is a
derivative of the coca leaf." *United States v. Ross*, 719
F.2d 615, 617 (2d Cir. 1983). Until the advent last year
of the argument before this Court today, *see United
States v. Fernandez-Taveras*, 511 F. Supp. 3d 367, 373
(E.D.N.Y. 2021), courts uniformly understood "cocaine
isomers" to include only eight substances: natural co-
caine and its seven optical and geometric isomers.
(A. 57–58 (listing cases)).

49

## C.  Discussion

### 1.  Section 220.16(1) Does Not Reach Constitutional Isomers of Cocaine

The federal drug schedules include (1) cocaine and its optical and geometric isomers to the extent that they are a subset of "any salt, compound, derivative or preparation of cocoa leaves"; and (2) "any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances," although they do not define "chemically equivalent or identical." 21 C.F.R. §§ 1300.01(b), 1308.12(b)(4). New York State defines "narcotic drug" with reference to drug schedules that include cocaine and its isomers to the extent that they are a subset of "any salt, compound, derivative, or preparation thereof *which is chemically equivalent or identical with* any of these substances," although they do not define "isomer" or "chemically equivalent or identical." N.Y. PUB. HEALTH LAW § 3306, Schedule II(b)(4). This matters, because Judge Castel held that New York State's drug schedules necessarily include *all* isomers—including constitutional isomers—of cocaine. (A. 95). However, that is not what the statute says, what the statutory context and history imply, or what practice bears out. Rather, Judge Castel resorted to the type of strained reading of the statute that this Court has repeatedly said gives rise to the realistic probability test. Because the precise scope of the statute is unclear at best and because a defendant needs to resort to improbable hypotheticals to argue that the statute reaches non-optical/geometric isomers of cocaine, Judge Castel should have applied the realistic probability test; if he did so,

he would have found that Simmons was unable to offer any case in New York State in which the statute has been applied to the sale of non-optical/geometric isomers of cocaine.

At best, New York State's Schedule II(b)(4) is ambiguous about which isomers of cocaine it reaches. In *Townsend* and *Thompson*, this Court's task was simple: the relevant state statute "include[d] HCG as a Schedule III controlled substance," *Townsend*, 897 F.3d at 74, and did so "on its face," *Thompson*, 961 F.3d at 554. *See* N.Y. PUB. HEALTH LAW § 3306, Schedule III(g) ("Schedule III shall consist of the drugs and other substances, by whatever official name, common or usual name, chemical name, or brand name designated, listed in this section. . . . Chorionic gonadotropin [also known as hCG] . . . .").[24] Here, by contrast, New York State law includes:

> [1] Coca leaves and [2] any salt, compound, derivative, or preparation of coca leaves, and [3] any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances including cocaine and ecgonine, their salts, isomers, and salts of isomers . . .

---

[24] This Court's *Townsend* opinion contains a typographical error, stating that hCG is listed, by name, in Schedule III(7)(g), rather than in Schedule III(g). 897 F.3d at 74. However, there is no question that it is listed by name.

51

N.Y. PUB. HEALTH LAW § 3306, Schedule II(b)(4). However, the outer boundaries of "chemically equivalent or identical" substances "including cocaine and . . . [its] isomers" are not clear, as the statute does not define either "chemically equivalent or identical" or "isomers." In other words, the statute does not include constitutional isomers of cocaine "on its face." *Thompson*, 961 F.3d at 554. And, by including only those isomers that are "chemically equivalent or identical" with coca leaves and their derivatives (*i.e.*, cocaine, *see Ross*, 719 F.2d at 617), without any evidence that constitutional isomers are "chemically equivalent or identical" to cocaine, New York's Schedule II(b)(4) evinced no intent to cover constitutional isomers.[25] Far from being "an unambiguous state statute [that is] broader on its face than its federal counterpart," *Hylton v. Sessions*, 897 F.3d 57, 65 (2d Cir. 2018), the New York Schedule Is imprecise to the point of ambiguity about which cocaine isomers are controlled.

---

[25] Indeed, assuming, *arguendo*, that the federal and state statutes both considered "chemically equivalent or identical" to mean the same thing—and there is no way to know, as neither defines the term—to the extent that isomers of cocaine are "chemically equivalent or identical" substances, then they are also controlled federally. *See* 21 C.F.R. § 1308.12(b)(4) (including "any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances."). If so, there is no categorical mismatch between the state and federal schedules.

52

The absence in the New York State law of a quali-
fication—like that in federal law—that "isomer"
reaches only optical and geometric isomers is of little
moment. Not only was the New York State legislature
drafting its law in the context of the isomer defense,
which was only concerned with the optical isomer of
cocaine, but it did so against the background of an un-
derstanding that, as this Court explained, both cases
and testimony established that "cocaine has eight iso-
mers"—that is, natural cocaine and its seven optical
and geometric isomers—"only one of which is a deriv-
ative of the coca leaf." *Ross*, 719 F.2d at 617. Indeed,
in the 1970s—when New York State enacted the law
in question—and for decades afterward, courts
throughout the country uniformly explained their un-
derstanding that there were only eight isomers of co-
caine. (A. 57–58). As such, it is wholly reasonable to
assume that the New York State legislature meant
"isomers" of cocaine in the same way that every court
and expert did when discussing the cocaine isomer de-
fense.

Moreover, the structure of the entire state statute
—Section 3306—shows that an understanding that
the term "isomers"—which applies to hundreds of
drugs without qualification—to include constitutional
isomers would render the statute both absurd—inad-
vertently proscribing hundreds of thousands, if not
millions of substances (A. 60), and internally incon-
sistent (A. 61). *See, e.g.*, *United States v. Messina*, 806
F.3d 55, 70 (2d Cir. 2015) ("As the Supreme Court has
cautioned, interpretations of a statute which would
produce absurd results are to be avoided if alternative

53

interpretations consistent with the legislative purpose are available").

In light of the "universal accept[ance] that there are eight such isomers or theoretically possible molecular structures for the molecular formula known as 'cocaine,'" *Best v. State*, 556 A.2d 701, 712, 79 Md. App. 241, 264 (1989), it is unlikely—if not wholly illogical—to assume that New York intended the term "isomers" to refer to at least 12,271 constitutional isomers of cocaine. Instead, it makes sense that the New York State Legislature meant to include only those isomers that were widely understood to be the isomers of cocaine—natural cocaine and its seven optical and geometric isomers—rather than to radically expand upon that understanding without explicitly saying so. *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (legislatures "do[ ] not, one might say, hide elephants in mouseholes"). To reach further than that common understanding is to "resort to improbable hypotheticals," against which this Court has warned. *Hylton*, 897 F.3d at 63.

## 2. Simmons Did Not Meet His Burden of Demonstrating a Realistic Probability that Section 220.16(1) Would Be Applied to Constitutional Isomers of Cocaine

As the above discussion of the statutory text, context, and history shows, New York State's Schedule II(b) does not unambiguously include non-optical/geometric isomers of cocaine. Because the scope of the statute is, at best, ambiguous, courts should apply the realistic-probability test. It is clear that the "statute

54

has an indeterminate reach, and . . . minimum conduct analysis invites improbable hypotheticals," which entitles courts to turn to the "backstop": a defendant must "show a 'realistic probability' that 'the State would apply its statute to conduct that falls outside the generic definition of a crime.'" *Hylton*, 897 F.3d at 63. The burden of demonstrating such a "realistic probability" falls squarely on the defendant's shoulders. *See United States v. Scott*, 990 F.3d 94, 106 (2d Cir. 2021) (en banc). Simmons did not "carry the realistic-probability burden" by "at least point[ing] to his own case or other cases in which New York courts in fact did apply the statute in the manner for which he argues," *id.*— that is, for selling a non-optical/geometric isomer as a "narcotic drug"; as such, he failed to meet his burden of demonstrating a realistic probability that Section 220.16(1) would be applied to the sale of a Schedule II(b)(4) substance that is not federally controlled.

Accordingly, Simmons's 2013 drug conviction for selling cocaine constitutes a controlled substance offense, and Judge Castel erred in calculating Simmons's Guidelines as if it did not.

## POINT III

### Simmons's Sentencing Claims Are Meritless

Simmons contends, for the first time on appeal, that by mentioning Simmons's need for mental health treatment in discussing the reasons for Simmons's entire sentence, Judge Castel improperly imposed or increased an incarceratory sentence for the purposes of rehabilitation. (Br. 22–36). Simmons also argues that his 48-month sentence was substantively

55

unreasonable. (Br. 36–47). Because the sentence should be vacated in light of the Government's cross-appeal, *see supra* Point II, the Court need not address Simmons's sentencing claims, but they lack merit in any event.

## A.  Applicable Law

This Court's "review of criminal sentences includes both procedural and substantive components and amounts to review for abuse of discretion." *United States v. McIntosh*, 753 F.3d 388, 393–94 (2d Cir. 2014). "Procedural error occurs in situations where, for instance, the district court miscalculates the Guidelines; treats them as mandatory; does not adequately explain the sentence imposed; does not properly consider the § 3553(a) factors; bases its sentence on clearly erroneous facts; or deviates from the Guidelines without explanation." *Id.* at 394. This Court reviews *de novo* a district court's interpretation of the Guidelines. *United States v. Chappelle*, 41 F.4th 102, 107 (2d Cir. 2022). However, where, as here, a defendant argues for the first time on appeal that the district court inappropriately based a sentence on the need for rehabilitation, this Court reviews that aspect of procedural reasonableness for plain error. *See United States v. Crum*, 843 F. App'x 404, 405 (2d Cir. 2021).

A defendant arguing substantive unreasonableness "bears a heavy burden because [appellate] review of a sentence for substantive reasonableness is particularly deferential." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012). This Court does not "substitute [its] own judgment for the district court's on the

56

question of what is sufficient to meet the § 3553(a) considerations in any particular case," and sets aside a district court's substantive determination "only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc); *see also United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009) (substantive reasonableness standard is "a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law"); *United States v. Pope*, 554 F.3d 240, 246–47 (2d Cir. 2009) (this Court "will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor").

## B. Judge Castel Did Not Plainly Err by Mentioning Simmons's Mental Health Issues During Sentencing

Simmons challenges the procedural reasonableness of his sentence, contending that Judge Castel plainly erred by improperly considering the need to provide Simmons with mental health treatment. (Br. 20, 22–36). This argument fails, as it misreads the record. Judge Castel considered Simmons's need for mental health treatment—as Simmons urged him to do—in constructing Simmons's *entire sentence*—including three years of supervised release and a special condition of mandatory outpatient mental health treatment—as he was permitted to do. Indeed, there is no indication in the record that Judge Castel increased

57

Simmons's term of incarceration in order to rehabili-
tate Simmons, which would be improper under *Tapia
v. United States*, 564 U.S. 319 (2011). Rather, Judge
Castel based the term of imprisonment on factors such
as the danger Simmons posed in possessing a gun, and
with his extensive criminal history. Moreover, this
case illustrates the wisdom of the plain-error rule: any
confusion about whether Judge Castel's consideration
of Simmons's mental health issues increased his incar-
ceratory sentence could have been resolved very easily
had Simmons said something at sentencing.

## 1. Applicable Law

A sentencing judge is required to consider the need
for rehabilitation, including "the need for the sentence
imposed . . . to provide the defendant with needed edu-
cational or vocational training, medical care, or other
correctional treatment in the most effective manner,"
in imposing sentence. 18 U.S.C. § 3553(a)(2)(D). How-
ever, 18 U.S.C. § 3582(a) "precludes sentencing courts
from imposing or lengthening a prison term to promote
an offender's rehabilitation." *Tapia*, 564 U.S. at 332
(holding that the district court erred where it explicitly
stated that it sentenced the defendant to a longer in-
carceratory sentence in order to allow the defendant to
complete a 500-hour treatment program). In deciding
whether to impose probation or supervised release, a
district court may "consider whether an offender could
benefit from training or treatment programs." *Id.* at
330. As a condition of supervision, a district court may
also "require the offender to undergo available medi-
cal, psychiatric, or psychological treatment, including
treatment for drug or alcohol dependency, as specified

58

by the court, and to remain in a specified institution if required for that purpose." *Id.* In summary, all that is prohibited is *imposing or lengthening imprisonment* to account for rehabilitative treatment, not merely considering or imposing treatment as part of a sentence. *See United States v. Lifshitz*, 714 F.3d 146, 150 (2d Cir. 2013) ("While the district court also considered [the defendant's] need for medical care, there is no indication in the record that the district court based the length of [the defendant's custodial] sentence on his need for treatment"); *United States v. Gilliard,* 671 F.3d 255, 259 (2d Cir. 2012) ("[N]otwithstanding discussion of rehabilitation in the record, there [is] no error where the sentence length [is] based on permissible considerations, such as criminal history, deterrence, and public protection.").

## 2. Discussion

Simmons relied extensively on his mental health issues and need for treatment in seeking a low sentence, even providing the District Court with an expert psychiatric evaluation and medical records to establish his mental health problems. (A. 14–15, 28–29, 31, 34–39, 82–83, 97–99, 102).[26] Not surprisingly, therefore, in explaining his sentence, Judge Castel stated that he had reviewed, among other things, Simmons's

---

[26] As Judge Castel noted, some of Simmons's mental health problems also contributed to his danger to society: he told his expert psychiatrist that "I hear voices that tell me to kill people and kill myself." (A. 114).

59

expert psychiatric report and medical records (A. 112), and explained that:

> [Section] 3553(a) counsels that I take account of the seriousness of the offense and impose a sentence that promotes respect for law and provides just punishment; adequately deters others. Here, there's a very important consideration, and that is protecting the public from further crimes of this defendant and also providing the defendant with needed medical care in the most effective manner. These all come together in the case of Mr. Simmons. He desperately needs proper mental health treatment to get him on the right track when he is released from incarceration. . . .

> This is the unusual case. Upward variances are rare, as well they should be. Downward variances are common; upward ones are rare. And I consider it a rare step to go in that direction, but based on the need to get this individual the proper medical care and to protect the public from further crimes of this defendant, and taking account of the other 3553(a) factors which I have mentioned, the Court concludes that a sentence of 48 months' imprisonment, three years supervised release, waiver of the fine, based on limited assets, limited earning ability, and a special assessment of $100 is

60

> sufficient but not greater than necessary to achieve the purposes of section 3553(a).

(A. 115–16).[27] After Simmons declined to object to "the proposed sentence or the statements of reasons for that sentence" (A. 116), Judge Castel added special conditions of supervision that would provide Simmons with "proper mental health treatment to get him on the right track when he is released from incarceration" (A. 115), specifically: "participat[ion] in an outpatient mental health treatment program approved by probation [and] . . . continu[ing] to take any prescribed medications," as well as "release of available psychological and psychiatric evaluations and reports . . . to the healthcare provider" (A. 118). This was wholly appropriate. *See* 18 U.S.C. § 3553(a)(2)(D) (requiring consideration of the need for medical care in determining sentence); *Tapia*, 564 U.S. at 330 (explaining that a

---

[27] Simmons misleadingly excises part of the final sentence: Judge Castel explained the reasons that led him to impose the complete sentence—including supervised release—and Simmons uses ellipses to make it seem as if Judge Castel stated that the need for care factored only into the term of imprisonment: "*based on the need to get this individual the proper medical care and to protect the public from further crimes of this defendant, and taking the Court concludes that a sentence of 48 months' imprisonment . . . is sufficient but not greater than necessary to achieve the purposes of section 3553(a).*" (Br. 19 (quoting A. 115–16) (emphasis and alterations in Simmons's brief)).

61

district court may impose "medical, psychiatric, or psychological treatment" as a part of post-release supervision).

Nevertheless, Simmons argues that Judge Castel plainly erred because, Simmons suggests, Judge Castel "explicitly explained [his] 'upward variance' from the Guidelines range as a 'rare step' that was, in part, 'based on the need to get this individual the proper medical care.'" (Br. 2 (citing A. 116)). This selective quotation elides Judge Castel's reasoning, seeking to create the false impression that Judge Castel lengthened Simmons's imprisonment based on the need to provide mental health treatment.

*First*, Judge Castel discussed Simmons's mental and physical health issues at length at the sentencing proceeding, and expressed sympathy, explaining that "most every societal problem is right in the submissions in this case" and "[i]t's a sad record," and incarceration worked to Simmons's detriment. (A. 114–15). Judge Castel then cited the need to provide Simmons "with needed mental care in the most effective manner" in discussing key Section 3553(a) factors, concluding that Simmons "desperately needs proper mental health treatment to get him on the right track when he is released from incarceration," took account of "the need to get this individual the proper medical care" among other factors when crafting the complete sentence, including the statutory maximum term of supervised release,[28] and explicitly included treatment

_____

[28] The statutory maximum of supervised release was the top of the applicable Guidelines. (PSR ¶ 88).

62

programs as part of *supervised release*. (A. 115–16,
118). This was proper. *See United States v. Harry*, 566
F. App'x 100, 101 (2d Cir. 2014) ("[A]s *Tapia* recog-
nized, a district court is free to consider rehabilitation
goals in imposing non-penal sentences such as terms
of supervised release.").

*Second*, at no point did Judge Castel say—or imply
—that he was lengthening Simmons's term of impris-
onment in order to provide him with the opportunity
for rehabilitation.[29] Rather, Judge Castel explained, in
detail, the nature of the offense, the danger that Sim-
mons posed to society, and Simmons's frightening
criminal history, all of which supported a significant
sentence of imprisonment. (A. 113–14; *see also* A. 115
(explaining that, among the key factors considered
were "the seriousness of the offense," the need to "im-
pose a sentence that promotes respect for the law and
provides just punishment," the need to "adequately de-
ter[ ] others," and the need to "protect[ ] the public from
further crimes of this defendant," as well as the need
for medical care)). Indeed, the record decisively
demonstrates that Judge Castel did not impose incar-
ceration in order to ensure that Simmons could receive
treatment while in prison, as Judge Castel did not or-
der or recommend that Simmons receive *any* treat-
ment while in prison; rather, such treatment was lim-
ited to Simmons's term of supervised release. This

––––––––––

[29] Even if Judge Castel did consider Simmons's
mental health needs in crafting an incarceratory sen-
tence, there is no reason to believe that it increased the
sentence, as opposed to reducing it.

63

presents a sharp contrast with *Tapia*, in which the district court explicitly "indicated that Tapia should serve a prison term long enough to qualify for and complete" the 500-hour drug program, and then "strongly recommended" that Tapia participate in the program. 564 U.S. at 322; *cf*, *United States v. Neal*, 517 F. App'x 20, 21 (2d Cir. 2013) (remanding because the district court upwardly departed in order to provide sufficient time for the defendant to complete rehabilitative programs in prison).[30] As this Court explained: "A common theme exists between *Tapia* and those cases in which our sister circuits found error—in all four cases, the sentencing judge explicitly tied the need to impose a sentence of particular length to the defendant's ability

---

[30] Simmons cites *Neal* in support of his argument, stating that it is "near-indistinguishable." (Br. 27). But it is readily distinguishable, as the *Neal* sentencing court did precisely what the *Tapia* sentencing court did: recommend treatment in prison and state that the sentence had to be long enough to permit that treatment. Judge Castel did nothing of the sort. The other cases cited by Simmons—*United States v. Counterman*, 510 F. App'x 82 (2d Cir. 2013), and *United States v. Keenan*, 499 F. App'x 81 (2d Cir. 2013) (Br. 26–27)—similarly involved district judges who referred to sentencing defendants to "sufficient time for a treatment program that will have a lasting impact," *Counterman*, 510 F. App'x at 83, and "sufficient time so you can get treatment in prison," *Keenan*, 499 F. App'x at 83.

64

to participate in a drug treatment program. That connection is missing here." *Gilliard*, 671 F.3d at 260.

*Third*, Judge Castel's written statement of reasons confirmed that he did not increase Simmons's sentence in order to get him mental health treatment. Judge Castel explained his "reasons for the above Guideline sentence" in a single paragraph, and did not mention mental health treatment, rather citing, among other things, Simmons's "willful decision to possess and run down a city block with a .380 Kel-Tec model P-3AT pistol with ammunition and duck into an alley," his decision to come out of the alleyway toward the officer in defiance of the officer's command to get down, his statement that he was going to a fight, his lengthy criminal history, and his admission that he hears voices that urge him to kill. (A. 130). Indeed, Judge Castel only mentioned "the need to provide the defendant with needed medical care for his mental health issues" *after* he concluded that "[a]n upward variance from the Guidelines is appropriate in this case for all of the reasons stated above." (A. 131).

In short, Simmons relied significantly on his mental health needs. Judge Castel recognized those needs and discussed them as important among the Section 3553(a) factors he considered—as Simmons asked him to do—though he did not increase Simmons's sentence in order to afford him the opportunity to seek treatment in prison that would not be available to him with a shorter sentence. Indeed, he did not even recommend *any* particular treatment while in prison. This was not erroneous. *See Lifshitz*, 714 F.3d at 148 (no error where district court stated that "the most important

65

factors do seem to be promoting respect for the law and protecting the public from further crimes of this defendant. It also appears, although to a lesser extent, important to be sure that [the defendant] continues to get the type of medical care he is obviously in need of."). Moreover, even if Judge Castel's brief references to mental health treatment create some ambiguity—and they did not—Simmons did not raise his objection below, and he has not met his burden of establishing plain error. *See id.* at 149–50; *United States v. Olmeda*, 837 F. App'x 52, 54–55 (2d Cir. 2020) ("The district court's lengthy discussion of the § 3553(a) factors makes clear that the sentence was imposed due to the seriousness of the offense, the need for deterrence, and the need to protect the public. The mere mentioning of the need for mental health treatment does not indicate that the district court lengthened the term of incarceration for rehabilitative aims.").

## C. Simmons's Sentence Was Substantively Reasonable

Simmons also challenges the substantive reasonableness of his sentence, citing, among other things, his difficult childhood, and predominance of misdemeanors in his criminal history. (Br. 20–21, 36–47). Simmons essentially rehashes the arguments he made before Judge Castel, and disagrees with the weight that Judge Castel placed on various Section 3553(a) factors. This, he may not do, as "[t]he particular weight to be afforded aggravating or mitigating factors is a matter firmly committed to the discretion of the sentencing judge." *Broxmeyer*, 699 F.3d at 289; *see Pope*, 554 F.3d at 246–47.

66

While the District Court recognized and considered the various mitigating factors upon which Simmons focused at sentencing—and which he relies upon entirely in this appeal (Br. 38–40, 44–46)—such as his mental and physical health problems and troubling childhood (A. 112, 114–16, 131), it was particularly troubled by the danger inherent in Simmons's conduct underlying the Section 922(g)(9) conviction, as well as his lengthy, often-violent criminal history (A. 113–15, 130). This was wholly reasonable. Among other things, Simmons was caught with a gun in "a very dangerous situation" where it was "miraculous that there wasn't gunfire on the streets as a result of this episode." (A. 113).[31] After leading the police on a chase with a gun, Simmons approached the police, putting everybody in danger. (A. 113). Simmons told the police—on video—that he had the gun because he "was about to have a fight." (A. 85, 113). Simmons had "an extensive criminal record"[32] that included criminal possession of

---

[31] Simmons offhandedly dismisses the seriousness or danger of his offense because he "did not fire the gun, harm or threaten anyone with it, or use it to commit another crime." (Br. 37). Judge Castel disagreed. (A. 113).

[32] Simmons dismisses his entire criminal record because: (1) it is so long that some of it happened years earlier (A. 44–45); and (2) his overwhelming adult record only included one felony, which Simmons's further downplays by characterizing the felony as a "misdemeanor-equivalent" (A. 43). Of course, Judge Castel

a weapon, the conviction for beating the mother of his infant as she held the child, and an assault where Simmons "struck the complain[an]t about her face and head with a closed fist, and choked and kicked the complainant. So it's a serious criminal record." (A. 114).[33] Moreover, Simmons had sustained "14 orders of protection," and told his psychiatrist that voices told him to kill others as well as himself. (A. 114).

Ultimately, Simmons's argument as to substantive reasonableness boils down to a disagreement with how Judge Castel weighed the sentencing factors in his case. However, "[t]he particular weight to be afforded aggravating or mitigating factors is a matter firmly committed to the discretion of the sentencing judge." *Broxmeyer*, 699 F.3d at 289; *see Pope*, 554 F.3d at 246–47. Judge Castel thoughtfully and carefully considered each of the relevant sentencing factors—including the mitigating aspects of Simmons's history and characteristics—and the arguments of the parties. After doing so, he imposed a sentence above what he had found to be the Guidelines. *See, e.g.*, *Pope*, 554 F.3d at 247 (affirming as substantively reasonable an above-Guidelines sentence where the sentencing court

---

was permitted to look at the conduct in those offenses, and what he found was, not surprisingly, troubling.

[33] That was not all. Among other things, when Simmons was 16 years old, he was convicted of five counts of assault, five counts of robbery, one count of grand larceny, two counts of gang assault, one count of menacing, and one count of criminal possession of a weapon. (PSR ¶ 31).

68

considered "not only the nature and circumstances of the offense and the history and characteristics of defendant but also the need for deterrence and the need to protect the public from further crimes," and weighted those factors "informed, in part, by Pope's criminal history"). This Court should give "due deference to the sentencing judge's exercise of discretion," informed by its "institutional advantages" of having dealt with Simmons first-hand. *Cavera*, 550 F.3d at 190. Given Judge Castel's specific and accurate consideration of the appropriate sentencing factors, it cannot be said that 48 months' imprisonment falls outside the "range of permissible decisions," *id*.

69

**CONCLUSION**

**Simmons's conviction should be affirmed, and his sentence should be vacated and the case remanded for resentencing based on a correct Guidelines calculation.**

Dated:     New York, New York
           October 28, 2022

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                         *of America.*

MICHAEL D. MAIMIN,
T. JOSIAH PERTZ,
WON S. SHIN,
    *Assistant United States Attorneys,*
              *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 15,926 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: WON S. SHIN,
*Assistant United States Attorney*