# 21-3064-cr

To be argued by:
**KENDRA L. HUTCHINSON**

United States Court of Appeals
For the Second Circuit

_____

Docket Nos. 21-3064-cr & 22-118-cr

_____

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

-against-

VALDEZ SIMMONS, a/k/a Sealed Defendant 1,

*Defendant-Appellant-Cross-Appellee.*
_____

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**RESPONSE AND REPLY BRIEF FOR DEFENDANT-APPELLANT-CROSS-APPELLEE VALDEZ SIMMONS**

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8731

*Attorney for Defendant-Appellant*
**VALDEZ SIMMONS**

**KENDRA L. HUTCHINSON,**
*Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... ii

ARGUMENT ............................................................................ 1

I.  Section 922(g)(9) Violates Mr. Simmons's Second
    Amendment Right to Keep and Bear Arms. .................................... 1

    (Replying to Point I of the Government's Brief.) ............................ 1

    A.  Mr. Simmons is Part of "The People" Protected by the
        Second Amendment. ................................................................. 1

    B.  Neither *Heller, McDonald, Bruen,* Nor *Bogle* Dictate
        that Mr. Simmons's Conviction Is Presumptively
        Lawful ........................................................................................ 10

    C.  Employing a Flawed Analysis, the Government Has
        Failed to Meet Its Burden of Proving a National
        Historical Tradition of Disarming Domestic Abuse
        Misdemeanants. ....................................................................... 11

II. The Court Committed Reversible Error Under *Tapia*, and
    Mr. Simmons's Sentence Was Substantively Unreasonable. ........ 19

    (Replying to Point III of the Government's Brief.) ........................ 19

III. The District Court Correctly Ruled That Mr. Simmons's
     Conviction for N.Y. Penal Law § 220.16(1) Was Not a
     Controlled Substance Offense, and Thus Properly Declined
     to Enhance His Base Offense Level ............................................. 22

     (Responding to Point II of the Government's Brief) ..................... 22

     A.  Standard of Review ............................................................... 23

     B.  New York's Narcotic Drug Definition Includes All
         Isomers of Cocaine, Not Merely the Optical and
         Geometric Isomers Included in the Federal Definition ......... 23

     C.  Because the Statute is Facially Overbroad, the
         Government's Arguments Are Unavailing. ............................ 26

CONCLUSION ...................................................................... 32

CERTIFICATE OF SERVICE .............................................. 33

CERTIFICATE OF COMPLIANCE ..................................... 34

i

# TABLE OF AUTHORITIES

## *Cases*

*Badar v. Swissport USA, Inc.,*
  53 F.4th 739 (2d Cir. 2022) ................................................................ 29

*Brown v. Ent. Merchants Ass'n,*
  564 U.S. 786 (2011) ........................................................................... 18

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ..................................................................... *passim*

*Firearms Policy Coal., Inc. v. McCraw,*
  No. 4:21-cv-1245-P, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) .... 4, 5

*Hnatyuk v. Whitaker,*
  757 F. App'x 10 (2d Cir. 2018) .......................................................... 31

*Hylton v. Sessions,*
  897 F.3d 57 (2d Cir. 2018) ........................................................... 30, 31

*McDonald v. City of Chicago, Ill.,*
  561 U.S. 742 (2010) ........................................................................... 10

*New York State Rifle & Pistol Ass'n v. Bruen,*
  -- U.S. --, 142 S. Ct. 2111 (Jun. 23, 2022) .................................... *passim*

*People v. Burnett,*
  245 A.D.2d 460 (2d Dep't 1997) .................................................. 24, 27

*People v. Mizell,*
  72 N.Y.2d 651 (1988) ........................................................................ 29

*Range v. Att'y Gen. United States,*
  53 F.4th 262 (3d Cir. 2022) ................................................................. 7

*Riley v. County of Broome,*
  95 N.Y.2d 455 (2000) ......................................................................... 28

*Tapia v. United States,*
    564 U.S. 319 (2011) ............................................................... 19

*Williams v. Barr,*
    960 F.3d 68 (2d Cir. 2020) ................................................... 30

*United States v. Almonte,*
    21-cr-566 (S.D.N.Y. July 11, 2022) ..................................... 25

*United States v. Baez-Medina,*
    20-cr-24 (S.D.N.Y. July 1, 2021) ......................................... 26

*United States v. Bogle,*
    717 F.3d 281 (2d Cir. 2013) ................................................. 10

*United States v. Booker,*
    644 F.3d 12 (1st Cir. 2011) .................................................. 10

*United States v. Boyce,*
    2022 WL 2159890 (S.D.N.Y. June 15, 2022) ...................... 25

*United States v. Fernandez-Antonia,*
    278 F.3d 150 (2d Cir. 2002) ................................................. 27

*United States v. Fernandez-Taveras,*
    511 F. Supp. 3d 367 (E.D.N.Y. 2021) ................................. 26

*United States v. Ferrer,*
    20-cr-650 (S.D.N.Y. July 21, 2021) ..................................... 25

*United States v. Gilliard,*
    671 F.3d 255 (2d Cir. 2012) ................................................. 21

*United States v. Guzman,*
    2022 WL 17068800 (S.D.N.Y. Nov. 17, 2022) ..................... 25

*United States v. Hagood,*
    20-cr-656 (S.D.N.Y. March 9, 2022) .................................... 25

*United States v. Holmes,*
    2022 WL 1036631 (E.D.N.Y. Apr. 6, 2022) .............. 25, 27, 28

iii

*United States v. Jackson*,
No. 22-cr-59, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022) ............... 2

*United States v. Lawrence*,
21-cr-127 (S.D.N.Y. Aug. 18, 2022) ...................................................... 25

*United States v. Louissant*,
20-cr-685 (S.D.N.Y. Nov. 17, 2021) ...................................................... 25

*United States v. Maiuzzo*,
22-cr-313 (S.D.N.Y. Nov. 30, 2022) ...................................................... 25

*United States v. Minter*,
20-cr-389 (S.D.N.Y. Oct. 12, 2021) ................................................. 25, 29

*United States v. Perez-Gallan*,
2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) ........................... 4, 8, 14

*United States v. Taylor*,
142 S. Ct. 2015 (2022) ........................................................................ 31

*United States v. Thompson*,
961 F.3d 545 (2d Cir. 2020) ........................................................... 23, 30

*United States v. Todd*,
20-cr-256 (E.D.N.Y. Aug. 18, 2022) ...................................................... 25

*United States v. Townsend*,
897 F.3d 66 (2d Cir. 2018) ............................................................. 23, 25

*United States v. Venturella*,
391 F.3d 120 (2d Cir. 2004) ................................................................. 29

*United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) .......................................................................... 3, 7

*Williams v. Barr*,
960 F.3d 68 (2d Cir. 2020) ................................................................... 30

**Statutes**

18 U.S.C. § 921(a)(33) .......................................................................... 8

18 U.S.C. § 922(g)(9) ........................................................................ 1

21 U.S.C. § 802(44) ........................................................................ 30

N.Y. Penal Law § 70.15(1) ............................................................... 8

N.Y. Penal Law § 120.00(1) .............................................................. 8

N.Y. Penal Law § 220.00(7) ...................................................... 23, 26

N.Y. Penal Law § 220.16(1) ............................................. 22, 23, 25, 32

N.Y. Pub. Health Law § 3306 ..................................................... 24, 27

Tex. Health & Safety Code Ann. § 481.102(3)(D) ............................ 27

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................ 3

U.S. Const. amend. II ....................................................................... 1

U.S. Const. amend. IV ...................................................................... 3

U.S. Const. amend. IX ...................................................................... 3

U.S. Const. amend. X ....................................................................... 3

**United States Sentencing Guidelines**

U.S.S.G. § 2K1.2 ............................................................................ 22

U.S.S.G. § 2K2.1(a)(4)(A) .......................................................... 26, 32

U.S.S.G. § 4B1.2 ....................................................................... 22, 23

**Regulations**

21 C.F.R. § 1300.01(b) .................................................................... 24

21 C.F.R. § 1308.12(b)(4) ................................................................ 24

## *Other Authorities*

Reva B. Siegel, *"The Rule of Love": Wife Beating As Prerogative and Privacy,* 105 Yale L.J. 2117 (1996) ...................................................... 13

Carolyn B. Ramsey, *Firearms in the Family,* 78 Ohio St. L.J. 1257 (2017) ................................................................. 14

## ARGUMENT

I. **Section 922(g)(9) Violates Mr. Simmons's Second Amendment Right to Keep and Bear Arms.**

**(Replying to Point I of the Government's Brief.)**

Mr. Simmons argues that his conviction of 18 U.S.C. § 922(g)(9) violates the Second Amendment. In response, the government asserts that he is not entitled to Second Amendment protection, that the statute is presumptively lawful, and that, in any event, a historical tradition exists of disarming "dangerous" and "unvirtuous" felons that justifies permanently prohibiting gun possession for him, a domestic violence misdemeanant. It is incorrect in every regard.

A. <u>**Mr. Simmons is Part of "The People" Protected by the Second Amendment.**</u>

The government argues that, by virtue of his prior misdemeanor conviction, Mr. Simmons is not a member of "the people" protected by the Second Amendment. Gov. Br. at 19-23. *See* U.S. Const. amend. II ("the right of the people to keep and bear Arms, shall not be infringed"). This argument is textually wrong, is inconsistent with the *Bruen* framework, and cannot be squared with history or civil liberties jurisprudence as a whole.

1

Undoubtedly, Mr. Simmons, an American citizen, is among "the people" the Second Amendment protects. Just as that amendment does not "draw . . . a home/public distinction with respect to the right to keep and bear arms," *New York State Rifle & Pistol Ass'n v. Bruen*, -- U.S. --, 142 S. Ct. 2111, 2134 (Jun. 23, 2022), it does not draw a distinction between those with and without a criminal history. As *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008), made clear, "the people" covered by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." And citing *Heller*, *Bruen* did not circumscribe the Second Amendment's ambit by a person's status, but rather by the conduct being regulated: "when the Second Amendment's plain text covers an individual's *conduct*, the Constitution presumptively protects that *conduct*." 142 S. Ct. at 2126 (emphasis added). *See also United States v. Jackson*, No. 22-cr-59, 2022 WL 3582504, at *2 (W.D. Okla. Aug. 19, 2022) ("This Court declines to read into *Bruen* a qualification that Second Amendment rights belong only to individuals who have not violated any laws").

Moreover, the government would read the term in isolation, but it appears elsewhere in the Bill of Rights. As *Heller* explained, "the

people" is a "term of art employed in select parts of the Constitution."
554 U.S. at 579. In this context, "the people" has one unitary meaning:
it "refers to a class of persons who are part of a national community or
who have otherwise developed sufficient connection with this country to
be considered part of that community." *United States v. Verdugo-
Urquidez*, 494 U.S. 259, 265 (1990). Indeed, the phrase appears not only
in the Second Amendment, but also in the First, Fourth, Ninth, and
Tenth. U.S. Const. amend. I ("the right of the people to peaceably
assemble, and to petition the Government for a redress of grievances");
*id*. amend. IV ("the right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches and
seizures"); *id*. amend. IX (unenumerated rights "retained by the
people"); *id*. amend. X (non-delegated rights "reserved to the States
respectively, or to the people").

The Founders certainly did not intend that those with
misdemeanor convictions like Mr. Simmons's could be searched and
seized unreasonably or prevented from peaceably assembling. By the
same logic, the Founders likewise did not intend to omit
misdemeanants from the Second Amendment's scope. *See Verdugo-*

3

*Urquidez*, 494 U.S. at 265 (the same "people" are protected by the First, Second, Fourth, Ninth, and Tenth Amendments). *See also United States v. Perez-Gallan*, No. 22-cr-00427-DC, 2022 WL 16858516, at *9 (W.D. Tex. Nov. 10, 2022) ("if 'the people' is restricted to 'law-abiding, responsible citizens,' and 'the people' means the same group in the First and Fourth Amendments, those other constitutional protections are endangered") (citing *Heller*, 554 U.S. at 644 (Stevens, J. dissenting)).

The opening clause of the Second Amendment further demonstrates that the Founders did not consider people with a minor criminal history to generally not be part of "the people." The *Heller* Court explained that "the Second Amendment's prefatory clause" – "A well regulated Militia, being necessary to the security of a free State" – "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. Given that "stated purpose, logic demands that if an individual was (or is) a member of the 'militia,' the Second Amendment's protections extend at least to those who constitute the militia." *Firearms Policy Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 WL 3656996, at *5 (N.D. Tex. Aug. 25, 2022).

4

In the first Militia Act, enacted one year after the Second Amendment's ratification, Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271. The Act further stipulated that "every citizen so enrolled . . . shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm equipage, including ammunition. *Id*. Although the Act "exempted" certain classes of people from its requirements ("all custom-house officers," "all ferrymen employed at any ferry on the post road"), convicts – let alone misdemeanants – were not among those excluded. *Id*. § 2, 1 Stat. 272.

As the Militia Act makes clear, at the time of the founding, people with misdemeanor convictions were not only permitted to possess firearms, they were legally required to do so in some circumstances. Given this Founding-era legal obligation, holding that such people now lack Second Amendment rights would be textually and historically untenable. *See McCraw*, 2022 WL 3656996, at *5 ("It would be illogical

5

to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn").

The government makes much of *Heller's* use of the phrase "law-abiding citizens," and *Bruen's* repetition of it, to argue that people like Mr. Simmons – with a remote misdemeanor resulting in a time-served sentence – are not entitled to keep and bear arms. Gov. Br. at 19-23. The plain text of the Second Amendment has no such restriction. *See Bruen*, 142 S. Ct. at 2119 (analysis begins with the "plain text of the Second Amendment"). Nor was there dispute in either *Bruen* or *Heller* as to whether the petitioner was a member of "the people," and thus the Court's use of the phrase was dicta. *See, e.g., id.* ("undisputed" that petitioners were part of "the people").

In any event, as the *Heller* Court explained, "whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. This language establishes a constitutional floor, not a ceiling; it sets out that law-abiding citizens are protected by the Second Amendment, not that

6

misdemeanants are not. *Bruen* itself shows this: the scope of the right it ratified, the right to bear arms outside the home, exceeded that recognized in this oft-quoted *Heller* passage, *i.e.,* the right to self-defense in the home. 142 S. Ct. at 2122.

The government also points to what it deems *Bruen's* footnoted "approval" of "shall-issue" firearm licensing schemes requiring background checks as supporting its view that only individuals without a criminal history enjoy Second Amendment protection. Gov. Br. at 20-21. This is once again dicta, unnecessary to the Court's result in that case; indeed, the *Bruen* Court did "not rule out constitutional challenges" to such regulations. 142 S. Ct. at 2138 n.9 (discussing how the schemes "appear[]" to operate). Regardless, whatever the Court's musings may mean in some future case for those with serious felonies, the fact remains that here, Mr. Simmons is only a misdemeanant with a low-level state crime resulting in a minimal sentence.[1]

---

[1] In *Range v. Att'y Gen. United States*, 53 F.4th 262, 271-74 (3d Cir. 2022), the Third Circuit recently upheld § 922(g)(1) after a Second Amendment challenge, deciding that felons were not "law-abiding" and thus excluded from "the people" covered by the amendment. First, *Range's* holding only applies to those convicted of felonies or state misdemeanors carrying two-year sentences: "By no means do we suggest that legislatures have carte blanche to disarm anyone who commits any crime. Rather, we decide only that the disarmament of individuals convicted of felony and felony-equivalent offenses comports with the Second Amendment." *Id.* at

And in fact, the fallacy of the government's position that only "law abiding" people are entitled to Second Amendment protection is obvious if it is drawn to its logical conclusion. Law-abiding is an amorphous term, susceptible of many meanings. And people fail to abide by the law all the time. For example, they park illegally or drive over the speed limit. Yet it cannot be that the trivial transgression of a driving ticket means the Second Amendment no longer applies, or that a legislature may disarm a minor traffic scofflaw permanently. *See Perez-Gallan*, 2022 WL 16858516, at *9. Under the government's view of the Second Amendment's protections, however, a judge or legislature could decide that abiding by the law includes just such requirements.

Presumably, the government seeks to avoid this laughable result by pointing out that the misdemeanor at issue "has, as an element, the use or attempted use of physical force." Gov. Br. at 21 (quoting 18

---

274 n.14. New York Penal Law § 120.00(1), a class A misdemeanor, is neither a felony nor felony-equivalent. *See* N.Y. Penal Law § 70.15(1) (maximum sentence is 364 days). Thus, the *Range* court's endorsement of several arguments made by the government in Mr. Simmons's case is not germane here. *See, e.g., Range*, 53 F.4th at 273 (quoting, as justification for holding, Justice Scalia's majority opinion in *Heller* "twice describe[ing] 'prohibitions on the possession of firearms by *felons*' as both 'longstanding' and 'presumptively lawful[.]'") (emphasis added). In any event, *Range's* conclusion that status-based exclusion from the Second Amendment is constitutional is incorrect for the reasons stated in this brief, and should not be followed by this Court.

U.S.C. § 921(a)(33)). The government's view seems to be that a person is not law-abiding, and thus the Second Amendment does not apply, if he or she has committed this particular *type* of misdemeanor. The problem with this argument is everything stated above: the text of the Second Amendment does not contain this caveat; our understanding of the Bill of Rights and Founding history does not support it; and neither *Heller* nor *Bruen* ratified a status-based limit on Second Amendment rights.

In sum, people with low-level misdemeanor convictions do not lose their status as "people" under the Constitution. Rather, the Second Amendment "belongs to all Americans." *Heller*, 554 U.S. at 581; *accord Bruen*, 142 S. Ct. at 2156. Just as it does not "draw . . . a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, the Constitution does not draw a misdemeanant/non-misdemeanant distinction, either. Had the Founders intended the Second Amendment's use of "the people" to refer only to "law-abiding citizens," as the government defines that term, the Constitution's plain text would reflect that. That it does not – and that it uses the same "the people" term of art in the Second, First, Fourth, Ninth, and Tenth Amendments – plainly demonstrates that citizens like Mr. Simmons

9

enjoyed the protections of the Second Amendment in the Founding era, and continue to now.

### B. Neither *Heller, McDonald, Bruen,* Nor *Bogle* Dictate that Mr. Simmons's Conviction Is Presumptively Lawful

Citing cases that pre-date *Bruen*, the government asserts that § 922(g)(9) is "presumptively lawful." Gov. Br. at 23-24 (citing and quoting *United States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013); *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011)). The government reasons that *Heller* and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), stand for the proposition that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are permissible under the Second Amendment, and that this was not upended by *Bruen*. Gov. Br. at 24-25.

Even if that argument had merit, Mr. Simmons was not charged as a felon-in-possession under § 922(g)(1). Thus, any Supreme Court dicta in these cases, Gov. Br. at 26-28, is not applicable to Mr. Simmons, who is only a misdemeanant. This Court's decision in *Bogle*, 717 F.3d 281, also concerned § 922(g)(1), so its analysis is not determinative of this appeal. In fact, the constitutionality of § 922(g)(9), Mr. Simmons's count of conviction, is an issue of first impression in this Circuit.

10

In any event, after *Bruen*, the Second Amendment test is crystal clear: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129-30. The government's assertion that some regulations enjoy "presumptive lawfulness" is directly contrary to *Bruen's* command. Thus, although the inapplicability of this argument renders Mr. Simmons's rejoinder unnecessary, he maintains that *Bruen* requires that every firearm regulation be subjected to the crucible of *Bruen's* Second Amendment analysis.

C. **Employing a Flawed Analysis, the Government Has Failed to Meet Its Burden of Proving a National Historical Tradition of Disarming Domestic Abuse Misdemeanants.**

There is no dispute that § 922(g)(9)'s prohibition – simple possession of a common handgun – is covered by the Second Amendment. *See generally* Supp. Br. at 14-15. Therefore, "the burden falls on" the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129, 2135. Not only has the

11

government failed to meet its burden, but, in doing so, it employs an incorrect analysis.

*Bruen* sets forth a dual-track analytical framework. When a challenged regulation addresses a "general societal problem that has persisted since the 18th century," the court engages in a "straightforward historical analysis:" the government must show "a distinctly similar historical regulation addressing that problem." *Id*. at 2131. Only as to "other cases implicating unprecedented societal concerns or dramatic technological changes," or concerning "modern regulations that were unimaginable at the founding," may the government meet its burden using "analogical reasoning," which involves a "relevantly similar" inquiry. *Id*. at 2132.

The government entirely glosses over this distinction and attempts to justify § 922(g)(9) solely through historical analogy and the "relevantly similar" test. Gov. Br. at 29, 39. Thus, it argues at length about the common law and Founding-era historical traditions of disarming "dangerous persons," including the odious practice of denying guns to Native Americans, Catholics, Quakers, and slaves, Gov. Br. at 29-31; the concept of "virtuous citizenry," Gov. Br. at 31-35; and the

12

civic death and capital punishment visited upon felons under common law, Gov. Br. at 35-39. After this lengthy survey, it urges the Court to conclude that Section 922(g)(9)'s disarmament of domestic violence misdemeanants is "relevantly similar" to these historical analogues. Gov. Br. at 39.

But this case demands "straightforward historical analysis," not "analogical reasoning." *Bruen*, 142 S. Ct. at 2131-32. Domestic abuse is a "general societal problem that has persisted since the 18th century." *Id.* at 2131. *See* Reva B. Siegel, *"The Rule of Love": Wife Beating As Prerogative and Privacy,* 105 Yale L.J. 2117, 2122 (1996) ("Until the late nineteenth century, Anglo-American common law structured marriage to give a husband superiority over his wife in most aspects of the relationship . . . . [A] husband could command his wife's obedience, and subject her to corporal punishment or 'chastisement' if she defied his authority) (citing Blackstone's Commentaries). Accordingly, the government must show a "distinctly similar historical regulation addressing that problem." *Bruen*, 142 S. Ct. at 2131.

But the government does not – indeed it cannot – point to any historical tradition whatsoever of disarming abusers around the time

the Constitution was framed. While the Puritans declared spousal abuse illegal, "typical colonial punishments included whipping and the stocks." Carolyn B. Ramsey, *Firearms in the Family,* 78 Ohio St. L.J. 1257, 1301 (2017). It was not until the late 1800s that English and American authorities, generally, begin to repudiate the "marital chastisement" doctrine. Siegel, *supra* at 2118. But even then, "wife beaters in the 1800s and early 1900s often served short jail terms, paid substantial fines, or both. Judges in this time period were more likely to confiscate a wife beater's liquor than his guns." Ramsey, *supra* at 1301.

Recently, in *United States v. Perez-Gallan*, the court conducted a historical analysis of domestic violence punishment and, ultimately, concluded that the government did not meet its burden to prove the constitutionality of § 922(g)(8) (prohibiting weapon possession by those subject to protection order). It noted that, "until the mid-1970s, government intervention – much less removing an individual's firearms – because of domestic violence practically did not exist." 2022 WL 16858516, at *5 (reviewing historical literature and finding, for example, only 20 cases of prosecuted domestic abuse between 1633 and 1802 in Plymouth Colony).

14

As the Supreme Court instructed in *Bruen*, when a challenged regulation addresses a longstanding societal problem:

> [T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.

142 S. Ct. at 2131. Section 922(g)(9) easily meets both these rules. The government has pointed to no national historical tradition of barring domestic abusers from gun ownership. And what evidence there is suggests that when domestic violence was addressed, it was through materially different means.[2] Section 922(g)(9) is thus unconstitutional.[3]

Even if the Court were to accept the government's invitation to subvert *Bruen* and reason by historical analogy, rather than employ the proper "distinctly similar" test, the government's arguments for carving out Second Amendment exceptions for any group labeled "dangerous" or

---

[2] For further evidence of the lack of laws disarming spousal abusers, *see* Duke Center for Firearms Law database, cited by the government at p. 30 fn.11. https://firearmslaw.duke.edu/repository/ search-the-repository/.

[3] It bears repeating that § 922(g)(9) is of very recent vintage: domestic violence misdemeanants were not restricted from possessing firearms until 1996. *See* Supp. Br. at 16-17.

15

"unvirtuous" are unavailing. As explained above, that effort relies on a handful of English common law and founding-era statutes disarming specific groups (slaves, Native Americans, Quakers, and Catholics), from which the government would glean the much broader principle that "dangerous" or "unvirtuous" groups, in general, do not enjoy the right to keep and bear arms.

But this is exactly the maneuver the Court rejected in *Bruen*. There, the state argued that several laws prohibiting "affray," *i.e.,* coming before the King's justices or ministers or to fairs and markets "with force and arms," plus nineteenth century laws that "proscribed the concealed carry of pistols and other small weapons" in public, as well as surety laws, all evinced a broad, unparticularized power to regulate carrying firearms in public. *Bruen*, 142 S. Ct. at 2139-50. But the Supreme Court rejected the government's attempts to read these laws broadly, whether singly or in the aggregate. Rather, the Court held that they stood for exactly what they said, and evinced a small number of "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner by which one carried arms" (concealed vs. open), and "the

16

exceptional circumstances under which one could not carry arms" (if a surety statute applied). *Id.* at 2156. But that was all. The state could not extrapolate, from these specifics, a general power to regulate public carry more broadly.

Here, the government makes the same move. It has identified a few specific examples of conduct that historically has been constitutionally unprotected (e.g., "going armed to terrify the King's subjects," "bearing arms in a way that spreads 'fear' or 'terror' among the people," or "the bearing of arms by those deemed not to have white society's interests at heart," *see* Gov Br. at 29-31), moved up the level-of-generality ladder to a descriptor that unites these discrete examples (e.g., "the bearing of arms by dangerous persons"), and then applied that umbrella term to all conduct that (arguably) falls in the broader category (e.g., gun possession by domestic violence misdemeanants). *Bruen* makes clear the government cannot abridge fundamental constitutional rights in this way.

In addition, the Second Amendment exceptions that the government's approach would produce are grossly overbroad. The category of "dangerous" persons, for example, is neither "well-defined,"

17

*Bruen*, 142 S. Ct. at 2156, nor "narrowly limited." *Brown v. Ent. Merchants Ass'n,* 564 U.S. 786, 791 (2011) (First Amendment exceptions must be "well-defined and narrowly limited"). "Dangerous" is an elastic, malleable term that, in the wrong hands, could be applied to virtually any group of people – and one that the government could therefore use to "shoehorn" historically protected groups into unprotected status. *Brown*, 564 U.S. at 793. If an open-ended catchall term like "dangerous" could justify disarmament, legislatures would be free to "eviscerate" the right to keep and bear arms. *Bruen*, 142 S. Ct. at 2134. The "unvirtuous" label is even less "well-defined" and "narrowly limited." That term is so capacious that the government might use the "virtuousness" theory to disarm a seemingly endless number of groups, from serial liars to those who cheat on their spouses.

But this is means-ends balancing all over again—the mode of analysis *Bruen* repudiated. The only way to avoid this is to conduct the analysis at a more "administrable" level of specificity that is tightly tethered to the historical record. *See id*. at 2130. Just as "the very enumeration of the [Second Amendment] right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the

18

right is *really worth* insisting upon," *id*. at 2129 (emphasis in original),

so too it deprives government of the power to decide who falls into

nebulous categories like "dangerous" or "unvirtuous." Thus instead of

asking whether Founding-era laws prohibited firearm possession by

"dangerous" or "unvirtuous" people—categories broad enough to sweep

in almost anyone—the Court must ask whether such laws, like §

922(g)(9), denied firearms to those with misdemeanors or low-level

crimes involving domestic violence. Any other approach risks

embroiling courts in "independent means-end scrutiny under the guise"

of a historical comparison. *Id*. at 2133 n.7.

In sum, because Mr. Simmons's conviction violates the Second

Amendment, the judgment should vacated and indictment dismissed.

## II.  The Court Committed Reversible Error Under *Tapia*, and Mr. Simmons's Sentence Was Substantively Unreasonable. (Replying to Point III of the Government's Brief.)

Mr. Simmons argues that the district court violated *Tapia v.

United States*, 564 U.S. 319 (2011), by lengthening his prison term

based on his rehabilitative needs. The parties are in substantial

agreement on the law. *Compare* App. Br. at 22-25 *with* Gov. Br. at 55-

58. Where they disagree, however, is on how this Court should interpret

the facts. Because the government's view of the record is unsupported, this Court should vacate the sentence and remand for resentencing.

The government first suggests that the district court's discussion of Mr. Simmons's rehabilitative needs only was in the context of crafting Mr. Simmons's supervised release term and conditions. Gov. Br. at 61. The problem with this argument is that it ignores the court's statement immediately preceding imposition of sentence, "This is the unusual case. Upward variances are rare, as well they should be. Downward variances are common; upward ones are rare. And I consider it a rare step to go in that direction, but based on the need to get this individual the proper medical care . . ." (A. 116). True, the court imposed *both* the term of incarceration and term of supervised release after this and its release conditions included mental health treatment. However, the court explicitly tied its consideration of Mr. Simmons's medical needs with its *upward variance.* The only upward variance in the case was as to the prison term; the supervised release term was within the guidelines range. There could not be a clearer example than this of a court increasing the prison term based on prohibited reasons.

20

Second, the government notes that Judge Castel did not say he was imposing imprisonment of a certain length so that Mr. Simmons could complete treatment while incarcerated. Gov. Br. at 63-64. The government is factually correct. But while *United States v. Gilliard*, 671 F.3d 255 (2d Cir. 2012), the case upon which the government chiefly relies, cites this fact approvingly, it does not hold that it is required to find error. It is but one fact among several that could lead to remand. In a case such as this, with a court's express pronouncement about rehabilitation being the reason for an upward variance just before sentence, and reiteration of this in the written statement of reasons, it is simply not necessary for the judge to *also* use the language at issue in *Gilliard*.

Third, the government claims that the written statement of reasons supports affirmance. Gov. Br. at 64. This is a puzzling argument. Yes, the district court did state it was imposing an upward variance for "all of the reasons stated above" (A. 131). But it also said that "While all section 3553(a) factors were considered, among those of *special prominence* are the need to protect the public from further crimes of this defendant and the need to provide the defendant with

21

needed medical care for his mental health issues" (A. 131). Again, it is hard to imagine a clearer indication that Mr. Simmons's sentence was lengthened – by a "rare" upward variance – because of the court's consideration of his rehabilitative needs.

Finally, Mr. Simmons relies principally on his opening brief as to the argument that his sentence is substantively unreasonable. Accordingly, the Court should vacate the sentence and remand for resentencing.

## III. The District Court Correctly Ruled That Mr. Simmons's Conviction for N.Y. Penal Law § 220.16(1) Was Not a Controlled Substance Offense, and Thus Properly Declined to Enhance His Base Offense Level.

### (Responding to Point II of the Government's Brief)

New York Penal Law § 220.16(1) penalizes possession of all isomers of cocaine, while the federal controlled substance offense definition only covers optical and geometric isomers. Accordingly, the district court correctly ruled that Mr. Simmons's 2013 conviction for this offense categorically was not a controlled substance offense under U.S.S.G. § 4B1.2, and properly declined to enhance his base offense level per U.S.S.G. § 2K1.2. The government raises a smorgasbord of arguments to the contrary. Because the statute is clear, unambiguous,

22

and overbroad on its face, however, the government's attempts to salvage § 220.16(1) are unavailing.

## A. Standard of Review

The parties agree on the relevant legal framework. This Court "review[s] de novo a district court's specific determination that a prior offense was a controlled substance offense, as defined by U.S.S.G. § 4B1.2." *United States v. Townsend*, 897 F.3d 66, 69 (2d Cir. 2018). Whether an offense qualifies is evaluated utilizing the "categorial approach," which requires a  court to examine the "elements"  rather than "the particular facts" of an offense. *United States v. Thompson*, 961 F.3d 545, 549 (2d Cir. 2020). A state statute that criminalizes more conduct than its federal counterpart is "overbroad," will not be a "categorical match," and cannot qualify as a controlled substance offense. *Id.* at 553. *See also Townsend*, 897 F.3d at 74.

## B. New York's Narcotic Drug Definition Includes All Isomers of Cocaine, Not Merely the Optical and Geometric Isomers Included in the Federal Definition.

Mr. Simmons was convicted of New York Penal Law § 220.16(1), prohibiting possession of a "narcotic drug" with intent to sell. Narcotic drug is defined in N.Y. Penal Law § 220.00(7) to include any substance "listed in schedule I(b), I(c), II(b) or II(c) other than methadone." In

23

turn, Schedule II(b)(4), found in N.Y. Pub. Health Law § 3306, includes

cocaine and certain derivatives, and is defined as follows:

> Coca leaves and any salt, compound, derivative or
> preparation of coca leaves, any salt, compound,
> derivative, or preparation thereof which is
> chemically equivalent or identical with any of
> these substances, including cocaine and ecgonine,
> their salts, *isomers*, and salts of isomers . . . .

 (emphasis added). There is no restriction, qualification, or further

definition of "isomers" in the law.

The relevant federal controlled substance schedule, Schedule II,

also regulates cocaine and certain derivatives, including isomers. 21

C.F.R. § 1308.12(b)(4). However, there is a critical difference between

the two schedules. Under 21 C.F.R. § 1300.01(b), the federal definition

of cocaine isomers is limited: "As used in § 1308.12(b)(4) of this chapter,

the term 'isomer' means any optical or geometric isomer."

New York's schedule plainly encompasses more conduct than the

federal counterpart because it controls possession of *all* cocaine isomers,

not just optical and geometric isomers. "[A] controlled substance under

Schedule II of Public Health Law § 3306 includes cocaine and all its

isomers." *People v. Burnett*, 245 A.D.2d 460, 460 (2d Dep't 1997) (citing

Schedule II(b)(4)).

24

Nor is this a distinction without a difference. As the government itself acknowledges, there are also constitutional and positional isomers, distinct from the federally-scheduled optical and geometric isomers. Gov. Br. at 47. New York controls these, but the federal schedule explicitly does not. *See* A. 25 (in report submitted for sentencing, expert chemist concluded that "New York's law is broader because it encompasses cocaine's isomers without restriction, and cocaine has 'constitutional' isomers—isomers that are not 'geometric' or 'optical' and thus fall outside the federal schedule").

The New York statute is thus overbroad, and a violation of N.Y. Penal Law § 220.16(1) is not categorically a federal controlled substance offense. *Townsend*, 897 F.3d at 74.[4] Accordingly, Judge Castel correctly

---

[4] District courts have uniformly held that the New York definition of "controlled substance" sweeps more broadly than the federal definition. *See* Sent'g Tr. 33–37, *United States v. Maiuzzo*, 22-cr-313 (S.D.N.Y. Nov. 30, 2022) (Karas, J.); *United States v. Guzman*, 2022 WL 17068800, at *4–5 (S.D.N.Y. Nov. 17, 2022) (Woods, J.); Sent'g Tr. 3–10, *United States v. Lawrence*, 21-cr-127 (S.D.N.Y. Aug. 18, 2022), ECF No. 54 (Gardephe, J.); Sent'g Tr. 32–38, *United States v. Todd*, 20-cr-256 (E.D.N.Y. Aug. 18, 2022) (Matsumoto, J.); Sent'g Tr. 13, *United States v. Almonte*, 21-cr-566 (S.D.N.Y. July 11, 2022), ECF No. 34 (Seibel, J.); *United States v. Boyce,* 2022 WL 2159890, *3 (S.D.N.Y. June 15, 2022) (Liman, J.); *United States v. Holmes*, 2022 WL 1036631, *11 (E.D.N.Y. Apr. 6, 2022) (Garaufis, J.); Sent'g Tr. 13–18, *United States v. Hagood,* 20-cr-656 (S.D.N.Y. March 9, 2022), ECF No. 87 (Engelmayer, J.); Sent'g Tr. 24–26, *United States v. Louissant*, 20-cr-685 (S.D.N.Y. Nov. 17, 2021), ECF No. 35 (Castel, J.); Sent'g Tr. 3–4, *United States v. Minter*, 20-cr-389 (S.D.N.Y. Oct. 12, 2021), ECF No. 69 (Koeltl, J.); Sent'g Tr. 45–46, *United States v. Ferrer*, 20-cr-650 (S.D.N.Y. July 21, 2021), ECF No. 25 (Buchwald, J.);

ruled that Mr. Simmons's base offense level was 14 and could not be enhanced under U.S.S.G. § 2K2.1(a)(4)(A), as Section 220.16(1) is "overbroad" and "does not qualify as a controlled substance offense within the meaning of the guidelines" since it penalizes possession of "all isomers of cocaine . . . while federal law confines itself to optical or geometric isomers of cocaine." A. 91.

## C. Because the Statute is Facially Overbroad, the Government's Arguments Are Unavailing.

The government's attempts to salvage § 220.16(1) boil down to one main argument, *i.e.,* that "on its face" the New York statute is not overbroad and that the Court should therefore apply the realistic probability test. *See* Gov. Br. at 49-54. The Court should reject these meritless contentions.

First, the statute is not "unclear" or "ambiguous," as the government asserts. Gov. Br. at 49, 50. Schedule II(b)(4)'s inclusion of all isomers without restriction, incorporated into the definition of narcotic drug through N.Y. Penal Law § 220.00(7), is clear. Moreover,

---

Sent'g Tr. 6–11, *United States v. Baez-Medina*, 20-cr-24 (S.D.N.Y. July 1, 2021), ECF No. 50 (Koeltl, J.); *United States v. Fernandez-Taveras,* 511 F. Supp. 3d 367, 373 (E.D.N.Y. 2021) (Garaufis, J.).

*Burnett,* 245 A.D.2d at 46, establishes that Schedule II(b)(4) includes "cocaine and all its isomers," and it is "axiomatic" that "federal courts defer to state courts' interpretation of their own statutes." *United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir. 2002). Notably, Section 3306 uses more limited definitions of isomers in other contexts. For example, Schedule I(d)(31) lists "2,5-dimethoxy-4-(n)-propylthiophenethylamine (2C-T-7)" and "its optical isomers." *See also* Schedule I(f)(5) ("methcathinone" and "its optical isomers"); Schedule I(f)(8) ("N-benzylpiperazine" and its "optical isomers"). The legislature plainly knew how to draft the controlled substance schedules to include only certain isomers for some narcotics, but chose not to do so for cocaine.

Equally unpersuasive is the government's contention that, at the time of enactment, courts and lawyers all "understood 'cocaine isomers' to include only eight substances: natural cocaine and its seven optical and geometric isomers." Gov. Br. at 48. Other states, including Illinois and Texas, "intentionally [included] positional isomers in their drug schedules." *Holmes*, 2022 WL 1036631 at *10 (citing 720 Ill. Comp. Stat. Ann. 570/206(b)(4); Tex. Health & Safety Code Ann. § 481.102(3)(D))

27

("The court doubts the eight-isomer reading could have been so 'widely understood[.]'"). Evidently, "New York was (and is) not the only state to define 'isomers' of cocaine broadly." *Id*.

Moreover, the legislative history shows that New York intentionally took a broader approach than the federal government in adding "isomers" without restriction. As the defense pointed out below, when the schedule was amended in the late 1970's, the legislature determined that the perceived problem with defendants employing what the government refers to as the "isomer defense," Gov. Br. at 48, "could be resolved . . . by enacting this amendment which would include all isomers of cocaine . . . in the schedule of controlled substances." *See* A. 26 (citing and quoting Sponsor's Mem., Bill Jacket, L. 1978, ch. 100 (NY)). Whether or not the government likes this legislative response, the fact remains that this is what New York chose to do. "[T]he legislative history of an enactment . . . 'is not to be ignored.'" *Riley v. County of Broome*, 95 N.Y.2d 455, 463 (2000).

Nor is there anything "absurd," as the government posits, about New York scheduling hundreds or thousands of cocaine isomers. Gov. Br. at 52. The "absurd results" doctrine has application only in

28

"exceptionally rare" cases, *Badar v. Swissport USA, Inc.,* 53 F.4th 739, 748 (2d Cir. 2022), and as it "serves to help resolve . . . ambiguity;" it may not be applied to circumvent the plain meaning of a statute, *United States v. Venturella*, 391 F.3d 120, 126–27 (2d Cir. 2004) (citations omitted). The statute is plain on its face so that doctrine has no application here.

In any event, it is not "absurd to think that the New York State Legislature, as a matter of convenience . . . , decided to throw its net widely, as the legislative history suggests." Sent'g Tr. 25–26, *Minter*. *See also People v. Mizell*, 72 N.Y.2d 651, 654 (1988) (holding that legislature enacted broad statute imposing criminal liability even for possession of unusable amounts of controlled substances: courts "cannot winnow out what may seem to be insignificant prosecutions by implying a threshold requirement the Legislature chose not to impose").

Given the lack of ambiguity, there is no reason to employ the "realistic probability" test and require Mr. Simmons to show an actual state prosecution for possession of the isomers at issue. Gov. Br. at 53-54. "The 'realistic probability' test simply does not apply 'when the statutory language itself, rather than the application of legal

29

imagination to that language, creates the realistic probability that a state would apply the statute to conduct beyond the generic definition.'" *Williams v. Barr*, 960 F.3d 68, 78 (2d Cir. 2020) (quoting *Hylton v. Sessions*, 897 F.3d 57 (2d Cir. 2018)).

In fact, this Court has held facial statutory overbreadth adequate to overcome the realistic probability test in this precise context, namely, a state controlled substance schedule that sweeps more broadly than its federal counterpart. In *United States v. Thompson*, this Court held that § 220.31 is not a 21 U.S.C. § 802(44) "felony drug offense" because the New York statute encompasses the sale of hCG, a non-federally-scheduled substance. 961 F.3d at 554. *Thompson* dismissed the government's argument that any overbreadth was "purely hypothetical," explaining that "'when the state statute on its face reaches beyond the generic federal definition,' no legal imagination is necessary to find that the state statute is overbroad." *Id.* (quoting *Williams*, 960 F.3d at 77–78). Because hCG "is included in New York's list of covered compounds, ... § 220.31 on its face criminalizes conduct that is not covered by the federal analog." *Id.* The issue here is just as simple as it was in *Thompson*: Section 220.16(1) criminalizes conduct –

possession of, with intent to sell, non-optical and non-geometric cocaine isomers – that is not covered by the federal analog. *See also, e.g., Hnatyuk v. Whitaker,* 757 F. App'x 10, 12 (2d Cir. 2018) (summary order) (realistic probability test "obviated" where Connecticut statute on its face included non-federally-scheduled drugs benzylfentanyl and thenylfentanyl).

Thus, "[t]his circuit . . . applies the categorical approach to a controlled substance offense by comparing the conduct captured by the state statute to the elements of the CSA crime without resort to a 'realistic probability' test or a catalog of state court decisions." *Hylton*, 897 F.3d at 65. Given this, "demanding that [Mr. Simmons] produce old state cases to illustrate what the statute makes punishable by its text" is obviated, unnecessary, and unduly burdensome. *Id. See also United States v. Taylor*, 142 S. Ct. 2015, 2024 (2022) (noting "the oddity of placing a burden on the defendant to present empirical evidence about the government's own prosecutorial habits" and "the practical challenges such a burden would present in a world where most cases end in plea agreements, and not all of those cases make their way into easily accessible commercial databases").

31

In sum, § 220.16(1) sweeps more broadly than the federal controlled substance offense. The district court thus correctly ruled that Mr. Simmons's base offense level could not be enhanced under U.S.S.G. §§ 2K2.1(a)(4)(A), 4B1.2(b).

## CONCLUSION

For the foregoing reasons and those stated in the opening brief, Mr. Simmons's conviction should be vacated and the indictment dismissed. At a minimum, his sentence should be vacated and the case remanded for resentencing.

Dated:    New York, New York
          December 27, 2022

Respectfully submitted,

_____/s/_____
Kendra L. Hutchinson
Federal Defenders of New York, Inc.
   Appeals Bureau
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8731
kendra_hutchinson@fd.org

*Counsel for Valdez Simmons*

## CERTIFICATE OF SERVICE

I certify that I have caused a copy of this Brief to be filed with the Court's CM/ECF system, which will effect service on all counsel of record.

Dated:   New York, New York
          December 27, 2022

                         /s/
                        **KENDRA L. HUTCHINSON**

## CERTIFICATE OF COMPLIANCE

1. This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and 32(e), and Local Rule 32(a)(4)(A) because:

> this Brief contains 6,613 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this Brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch in Century Schoolbook type style.

Dated:   New York, New York
      December 27, 2022

_____
    /s/
**KENDRA L. HUTCHINSON**

34